STATE OF VERMONT *v.* MICHAEL H. TEITLE.

(90 A2d 562)

February Term, 1952.

Present: SHERBURNE, C. J., JEFFORDS, CLEARY, ADAMS and CUSHING, JJ.

Opinion Filed May 6, 1952.

192

*Witters, Longmore & Akley* and *A. Pearley Feen* for the respondent.

*Clifton G. Parker,* Attorney General, *Reginald B. McShane,* State's Attorney and *Henry F. Black,* Special Prosecutor, for the State.

SHERBURNE, C. J. The respondent has been found guilty of second degree arson in setting fire to the so-called Eastman Block in St. Johnsbury at about 1 A. M. on October 2, 1948, and has come here upon exceptions.

The Eastman Block was owned by Harry and Frances Dolgin, and the respondent and his wife, the daughter of the Dolgins, as the owners of a drug store, occupied a part of the ground floor and basement. Against the easterly wall of the basement was a shelf or bench 4 to 6 feet long, 2 to 3 feet wide and 3 to 3½ feet high, which supported two compressor units and motors connected to the refrigeration in the Brody market, located in the same building and next door to the drug store. Over the drug store were some apartments, in one of which roomed Raymond DeForest and his wife's nephew, Bertram Bixby. When the fire was discovered it was in the vicinity of and above the bench in the basement. After the fire had been put out the top of the bench including the part under the motors, the wall back of it and the top of the ceiling for an area of 10 or 12 feet were found to be charred, and the covering on the electric wires for approximately 20 feet was found burned off in places, the wiring on the wall leading to the motors was scorched or burned, the copper tubing leading to the compressors was broken open, and the other equipment showed exposure to heat. After the fire paper or cardboard ashes were observed on the basement floor over an area of 10 or 12 feet in the vicinity of the shelf. Briefly stated, the State's evidence tended to show that the respondent had told DeForest, who had worked in the drug store some for him, about plans for remodeling and enlarging the store; that shortly before the fire the respondent mentioned to DeForest that a fire would give him a chance to rebuild the store and make it larger, and that if DeForest would help him he would make him manager

of the new store and would get Bixby a job with Mr. Dolgin; that on the night of the fire when Bixby was also present, the respondent for the third time mentioned a fire, and the three visited in the back room of the store talking about a fire after the store had closed for the night. Finally the three went down into the basement, and the respondent dropped some lighted matches into a large carton half full of crepe paper located about 18 inches from the side of the shelf upon which were the compressors and motors, the top of the carton being a little lower than the shelf. After the crepe paper caught fire each of the three threw his lighted cigarette into the carton, then they went upstairs and out the front door, which the respondent locked, and Bixby went to his room in the block, DeForest went to the railroad station to take the night train, and the respondent got into his car parked beside the store and drove away. Except for the corroborating testimony of two witnesses tending to show the respondent at the scene of the fire shortly before it was discovered, all the direct evidence came from DeForest and Bixby. The defenses were an alibi, lack of motive, and that the fire might have started from some defect in the compressors, motor or wiring. Before the trial both DeForest and Bixby had pleaded guilty to arson in connection with this fire.

A large part of the cross-examination of the accomplice DeForest was devoted to an attack upon his credibility by showing who and what the witness was. He testified that from the time he was born on Nov. 14, 1908 up to 1926 or 1927 he had gone by the name of Euclid Therriac, but had not done so since. That under that name he married Anna Beaulieu around 1926 or 1927. That he married his present wife, Mabel Bassett, in 1935. When asked where Anna Beaulieu was he replied that he didn't know and he didn't know how long since he had seen her. He was then asked, "Did you ever get a divorce from Anna Beaulieu?" and the question was excluded upon the objection of the State, and the respondent excepted. Later he testified that he had a daughter, but that he didn't know where she lived and that he hadn't seen her since 1926. He was then asked, "And you abandoned her when she was a year old, did you not?" and the question as put was excluded upon the objection of the State and the respondent excepted. Later, after admitting that he had pleaded guilty twice to selling intoxicating liquor and had been convicted on a charge of larceny, he testified that when he got his license for marriage to Mabel Bassett he told

the town clerk that it was his first marriage, and that he lied in doing so. He was then asked, "Why did you do that?" and the question was excluded upon the State's objection, and the respondent excepted.

 A reasonable opportunity to show in cross-examination that a witness is unreliable, prejudiced or biased is a matter of right, and much latitude is to be allowed in this line, but the extent to which it shall be permitted to proceed rests largely in the discretion of the trial court, whose action will not be revised here unless an abuse of discretion is shown, and the contrary not appearing, it will be taken that the ruling was made as a matter of discretion. *State* v. *Quesnel*, 116 Vt 68, 69 A2d 6; *State* v. *Schoolcraft*, 110 Vt 393, 8 A2d 682; *State* v. *Fairbanks*, 101 Vt 30, 34, 139 A 918; *State* v. *Long*, 95 Vt 485, 491, 115 A 734. Stated otherwise, the credibility of a witness is always open to attack, and a wide latitude is allowable to a cross-examiner for the purpose of showing who and what the witness is. *Cummings* v. *Conn. Gen. Life Ins. Co.*, 102 Vt 351, 363, 148 A 484; *State* v. *Slack*, 69 Vt 486, 493, 38 A 311. Where a witness is asked on cross-examination as to a particular fact not material to the issue for the purpose of impeaching him, his answer concludes the party by whom such question is put, and cannot be contradicted by other evidence, except as to a conviction of crime, which, if denied by the witness, may be proved by the record, supplemented, if necessary, by parol evidence as to the identity of the witness as the person whose conviction the record shows. 70 CJ 897, Witnesses, § 1099. Thus in *Huckabee* v. *Montgomery*, 113 Vt 75, 29 A2d 810, a denial by the plaintiff that he had ever cursed a person in his life, because a collateral matter, was not permitted to be contradicted by evidence that he used profane language the day after the assault in question. And in *State* v. *Fournier and Cox*, 68 Vt 262, 270, 35 A 178, 180, the opinion states: "Much latitude is allowed counsel in cross-examination of witnesses in regard to facts which bear directly upon their present character and moral principles and therefore essential to the due estimation of their testimony by the jury; questions like whether the witness has ever been confined in the state prison, and similar ones, are often allowed, although collateral to the main issue but relevant to the character of the witness." In *State* v. *Long*, 95 Vt 485, 492, 115 A 734, 737, a witness for the State was asked in cross-examination about his relations with a woman, and he denied any criminal

intimacy with her, and his statement was not permitted to be shown to be untrue because a collateral matter; and the opinion states: "A witness may be cross-examined as to collateral facts which tend to test his accuracy or veracity but the cross examiner must be content with the witness' answers, and cannot contradict them by independent proof."

Where it is sought to discredit a witness by inquiries regarding particular instances foreign to the issue, the exercise of the court's discretion is often determined by the nearness or remoteness of the occurrences. *State v. Meehan,* 86 Vt. 246, 249, 84 A 862. But it is not necessarily an abuse of discretion to deny cross-examination as to a fairly recent immoral act for the purpose of discrediting a witness. Thus in *State v. Long, supra,* at p. 491, where the respondent sought to question a witness for the State about his relations with a girl, and to show that they were such that the birth of a child resulted, it was held that the exclusion of the line of inquiry did not show an abuse of discretion.

The three excluded questions related to remote matters. Had the witness answered the question about divorce in the negative it would not prove the witness to be a bigamist, as the respondent claimed, since it did not appear that his first wife was alive when he married a second time. The question about abandoning his child was faulty because it made an assertion. 70 CJ 691, 899; *Walters v. State,* 174 Ind 545, 92 NE 537. The witness having admitted that he lied to the town clerk the court might reasonably think that that line need be pursued no farther.

The right of cross-examination is not to be impaired in any of its respects. But its extent is within the discretionary control of the trial court provided the right itself is not infringed. We have often said, as in *State v. Pierce,* 88 Vt 277, 92 A 218, that the modern tendency is toward greater liberality of cross-examination for the purpose of finding out who or what the witness is. But this by no means implies that the courts have abrogated the rule above stated. The pursuit of a witness into the realm of collateral matters must, of necessity, end somewhere—or litigation would not. The trial court's discretion must fix that limit, though the exercise of this administrative function be attended with some difficulties. *York v. Partridge's Estate,* 99 Vt 329, 333, 132 A 37. Here the cross-examination of this witness takes up 50 pages of the official transcript and shows a delving into almost every detail of the wit-

ness' past life. We do not think an abuse of discretion in excluding the offered evidence is shown, but even if it were, the record does not show harmful error.

The respondent excepted to the exclusion of a copy of the record of DeForest's marriage under the name of Euclid Therriac to Anna Beaulieu on February 1, 1927. This exhibit was offered to contradict statements made by DeForest upon cross-examination relative to when he last used the name Therriac and relating to his occupation at the time of that marriage. Those were collateral facts not material to the issue upon trial, and the exhibit was properly excluded for the reasons heretofore indicated.

■ It is unnecessary to consider respondent's exceptions 4 and 5. They are inadequately briefed. No rule of law is advanced to show error, and although cases are cited it is not pointed out wherein they show any error in the rulings made. We do not search authorities for reasons to overturn a ruling made below. See *Cobb* v. *Rutland Savings Bank,* 113 Vt 117, 121, 29 A2d 705. In any event the respondent was not harmed. He testified that he was not smoking at the time of the fire, although he took up smoking again later, that he had Berger's disease, and that Dr. Johnston gave him some advice with reference to the use of tobacco and its effect upon that disease, and Dr. Johnston testified that he recommended no smoking.

On cross-examination DeForest had testified that he had called up Mr. Sullivan from whom he had bought his furniture and had told him that the respondent had ordered him out of his tenement in the Eastman block and he couldn't afford to pay for the furniture, hadn't any place to put it and to come and get it. Later the respondent called Sullivan who testified to selling DeForest some furniture, but denied that DeForest called him and told him any such thing. Sullivan was then asked if he recalled approximately the amount of the sale, and the question was excluded and the respondent excepted. The reason for offering such testimony was that the respondent would later offer to show threats of DeForest to get even with the respondent, and that a part of such threat was that he lost this furniture, and that the respondent offered to show how much he agreed to pay for it, and how much he owed for it, when it was repossessed. During the discussion the Court asked how the size of the claim was material and received no answer

The attempt in the respondent's brief to now show how the size of the claim was material comes too late.

One Corriveau testified as a witness for the respondent that on the day DeForest left the employment of a Mr. Dubois, and the day before he left St. Johnsbury he told him that the respondent had promised him three months' free rent if he would fix up the apartment, but had told him to get out; that it was a dirty trick after fixing up the apartment and he was going to get even with the respondent by putting sugar in his gas tank. He was then asked to answer yes or no if he had some talk with Mr. Dubois about this conversation with DeForest, and the question was excluded subject to exception.

■ It is argued that the fact that the witness had talked with Dubois upon this subject was admissible as rendering more probable the truth of the witness' testimony. Subject to an exception not here involved, a litigant cannot corroborate himself or his own witness by showing extra-judicial acts, conduct or statements having that tendency. He cannot show the sayings of his witness out of court to corroborate his testimony given in court. *Phelps* v. *Utley,* 92 Vt 40, 42, 101 A 1011; *State* v. *Fairbanks,* 102 Vt 283, 291, 147 A 682, and cases cited.

■ The reason given why the answer to the excluded question should have been received does not comprehend the rule that on direct examination a witness may properly be asked to specify the grounds for his recollection. Wigmore on Evidence, 3rd ed., § 730. See *Miller* v. *Pearce,* 86 Vt 322, 85 A 620, 43 LRANS 332. Nor was the witness asked to give a ground for his recollection of what DeForest told him. Without any previous testimony by the witness that the talk with Dubois in any way refreshed his recollection of what DeForest told him, the talk with Dubois was introduced by a leading question. Assuming, but not deciding, that a witness, who has testified to an occurrence, may, after being asked to specify the grounds for his recollection of it, be permitted to testify that soon after the occurrence he told another the same story (58 Am Jur Witnesses, § 808), there is nothing here to show when the witness had the talk with Dubois, whether soon or long afterwards. If the fact of such a talk may ever be competent evidence of a ground for a witness' recollection of the matter narrated, a talk disconnected with the event testified to and long subsequent to it, induces or fortifies belief in the testimony so slightly

and is so heavily laden with prejudice as a self supporting assertion, that its introduction may be more injurious than helpful in the search for truth. Error in excluding the question is not shown.

The State's evidence tended to show that shortly after the fire had been started DeForest took the night train to New York City to visit his wife in South Norwalk, Connecticut; that he got to New York about noon and after eating some lunch called the respondent on the telephone at his store and talked with him about the fire; that later in the afternoon after getting to South Norwalk he again got the respondent on the telephone. To meet this evidence the respondent called Chief Christie, who testified that he was on duty at the police station located across the street from the Eastman Block on the day after the fire. Then he was asked: "Do you remember whether Mike Teitle came to the police station on more than one occasion on that day." The question was objected to. and the respondent offered to show that he came to the police station on several occasions on the day after the fire, and asked and received the chief's permission to use the police station telephone, and did so use it, and in connection with the offer stated that he would connect by showing that he was unable to use his own telephone in the store. After some discussion the offer boiled down to the proposition that the respondent was going to show that his telephone was out of order that day and that he was "going to corroborate it by the chief's testimony that he came there to use their phone on several occasions." The question was excluded and the respondent excepted. The same rule applies here as in the case of the last previous exception. In an attempt by analogy to get without the *res gestae* rule as applied in *State* v. *Daley,* 53 Vt 442, 444, and *State* v. *White,* 77 Vt 241, 242, 59 A 829, the respondent here argues that the offered evidence was not subject to the objection that it was self-serving, because at the time it could not be claimed that respondent had any interest to serve, and he could not have foreseen that he would be called upon to deny that he received the alleged calls from DeForest. As we view the matter the offered evidence was open to the suspicion that the respondent had planned to have an alibi in the event that the telephone talks should ever be used against him. It was offered merely to establish that the telephone was out of order and to strengthen other evidence of that fact. We see nothing about the offered evidence to bring it within the *res gestae* rule, as explained

in *Comstock's Admr.* v. *Jacobs,* 89 Vt 133, 143-145, 94 A 497. The conduct and declarations of the respondent offered to be shown were not contemporaneous with the discovery that the telephone was out of order, nor was there anything equivocal about the fact of the telephone being out of order that needed elucidation or explanation.

We need not consider exception 10. The question briefed is different than that raised below. When a reason is given below when taking an exception no other reason will be considered in review. *State* v. *Schoolcraft, supra; Lunnie* v. *Gadapee,* 116 Vt 261, 265, 73 A2d 312.

Chief Christie was asked if he could tell whether a night light was kept in respondent's drug store in the fall of 1948, and whether he ever observed a night light in that store in the months of September and October, 1948. Both questions were excluded subject to exception. It appeared that the witness had no opportunity to observe a night light on the night of the fire as he had gone to bed before store closing time. It was offered to corroborate the respondent and one of his witnesses that a night light was not kept in the store. So far as called to the lower court's attention or to our attention DeForest only testified to a night light being left on on the night of the fire. It is now claimed that the offered evidence contradicts DeForest and corroborates the respondent and Gloria Powell. No argument is advanced and no authority in point is cited to show error. This is insufficient briefing and merits no consideration.

It appeared in evidence that DeForest vacated the apartment in the Eastman Block and left St. Johnsbury on about December 17, 1948. The respondent having testified that at about the time DeForest left town someone put sugar in the gas tank of his automobile when it was parked beside the Eastman Block, he was asked if, as a result of the discovery of the sugar, he made a complaint against someone, and the question was excluded subject to exception. The respondent's offer, so far as material to the question briefed, was that "it isn't very likely that a man who had this man watch him commit arson, as the State claims, would a short time after seek to get him arrested" and that the making of the accusation alone is evidence in favor of the respondent that he was not a particeps; and that the respondent would show that there was sugar in the gas tank and that he complained to the village and

state police. Francis E. Smith of the State Police was called by the respondent and asked if the respondent at some time made a complaint against someone for putting sugar in his gas tank, and the question was excluded, subject to exception, upon respondent's offer to show that in December, 1948, the respondent called Smith and complained that DeForest had put sugar in his gas tank and wanted Smith to investigate, in order to meet the evidence of the State tending to show demeanor, acts or conduct of the respondent showing consciousness of guilt, and to show conduct and demeanor of the respondent tending to show the consciousness of innocence, contrary to the tendency of the evidence of the State. Smith having testified that he recalled the fire, was then asked if at some time later the respondent asked him to look at his automobile, and this question was excluded. The respondent then offered to show that in response to a call from the respondent the witness looked at his automobile and saw evidence of sugar having been placed in the tank, and the question was again excluded subject to exception. The respondent asked Chief Christie if at some time he received a complaint concerning DeForest, and the question was excluded, subject to exception, on the offer that at that time the respondent accused DeForest of putting sugar in his gas tank, and that as a result the witness made an effort to locate DeForest and was unable to do so.

No evidence of conduct tending to show a consciousness of guilt in the respondent is pointed out, as, for example, in the case of flight or attempted escape, which the offered evidence would tend to explain. The respondent relies upon statements in Wigmore on Evidence, 3rd Ed. §§ 174 and 293, to the effect that, despite the fact that the conduct of an accused person is so likely to be feigned and artificial, it should be received in evidence for what it is worth, as tending to show a lack of guilty consciousness or a consciousness of innocence, and that in ordinary life the bearing of one accused person as consciously innocent impresses us no less strikingly than the bearing of another as consciously guilty. Wigmore here states that it is judicially conceded that the inference of consciousness of guilt is a highly dubious one, and that the evidence is never to be emphasized or treated as of much value, and that if this is so, why should we strain a doubt to admit a dubious inference against the accused, and yet refuse to admit in his favor a scarcely more dubious one, and that such an attitude is wholly

inconsistent with itself and is out of harmony with the spirit of the law. He admits, however, that a majority of the courts exclude such evidence in favor of the accused, and the cases cited seem to show much more than a majority so holding. Wharton's Criminal Evidence, 11th Ed., § 505 states that "if such evidence were competent anyone guilty of a crime could supply himself with evidence by making statements in his favor or for that matter, commit overt acts in his favor, which he could introduce in the trial of a crime with which he is charged to show his innocence." And Underhill's Criminal Evidence, 4th Ed., § 255, states that the theory back of the rule of exclusion is that such evidence is not rejected because it may not aid in finding the truth, but because in the majority of instances it is false and misleading. Only one Vermont case bearing upon this question has been brought to our attention, that of *State* v. *Wilkins,* 66 Vt 1, 12, 28 A 323, 326, which states: "It has sometimes been held that when a person accused of a crime had an opportunity to escape and declined to avail himself of it, the fact might be introduced in evidence in his favor." Because the respondents were out on bail, and were therefore in the custody of the law, the fact that they did not run away was held not admissible in their favor as tending to show innocence.

Evidence of the conduct of the accused to show consciousness of guilt must not be so remote in time as to create a strong probability that other motives determined the conduct. Underhill's Criminal Evidence, 4th Ed. § 250. The same rule necessarily applies as to evidence of conduct to show consciousness of innocence, assuming that such evidence would otherwise be admissible, but which we do not decide.

The fire occurred on October 2, the events and conduct offered in evidence occurred about December 17, two and one-half months later. Up to that time and for a long time afterward the respondent had no apparent reason for thinking that anyone suspected that he had set the fire. Finding sugar in his gasoline tank, it was the natural thing for him to lay the blame on someone whom he didn't like and whom he suspected, and to make a complaint to the police. If he were guilty of setting the fire he knew that DeForest was likewise implicated, and would be unlikely to implicate himself in such a serious crime because of being charged with such a trivial offense as putting sugar in his tank. When thieves fall out over a division of the loot they do not usually complain to the

police, charging one of their number with the theft, when they know that if they do they themselves will be implicated in the same offense, and thus elect imprisonment for the sake of getting the other into prison. We will presume that the court in the exercise of its discretion excluded the evidence as being too remote in point of logical relation to the issue on which it was offered. *Dalpe* v. *Bissette,* 99 Vt 179, 182, 183, 130 A 591. Error does not appear.

Arnold Dolgin, a witness for the respondent, having testified to an occasion at his father's office when his father and Mr. Witters, respondent's attorney, were present, was asked if he learned from conversation between Witters and his father why Witters was there. The question was objected to, and the respondent offered to show that on Saturday, May 27, 1950, the father of the witness requested Witters to collect some rent due from DeForest, and to forward the claim to Connecticut attorneys for collection, and that the witness called the respondent on the telephone to learn where DeForest was living, and the respondent informed him South Norwalk and told him to have Witters collect for him too what DeForest owed him. The offered evidence was excluded subject to exception. For the reasons stated about the prior exception no error appears. The testimony was also offered as fixing the time when the respondent talked with Officer O'Brien, and counsel offered to connect it by showing that it was the same day that the respondent talked with O'Brien and gave him information as to the whereabouts of DeForest. This offer was excluded subject to exception. The respondent had testified that O'Brien had come into his store before he was arrested and that he thought it was the same week, and that upon an inquiry as to the whereabouts of DeForest he told him that he lived in Norwalk, Connecticut. Later O'Brien as a witness for the State testified that it was on May 29, 1950, that the respondent gave him DeForest's address. It is not made to appear that the discrepancy in dates as between May 27 and May 29 is of material consequence nor is it connected up by calling our attention to any testimony by the respondent that he had any such telephone conversation with the witness. Error is not made to appear.

Derwood E. McClure, an electrician, called as a witness by the respondent, who testified that he had only installed the electrical wiring in refrigerating equipment, and that all compressors are hooked up about alike whatever gas is used as a refrigerant, and

that it wasn't important to the electrician to know whether the gas was inflammable, and that he knew the different gases used, and that freon, sulphur dioxide and methyl were three of the most important gases used, was asked if he knew of his own knowledge if any of these were inflammable, and he answered "yes." He was then asked which, if any, to his knowledge, were inflammable, and the question was excluded on the ground that the witness had not qualified as an expert. He was next asked by what means he knew of his own knowledge which of these gases are inflammable, and the question was excluded on the ground that it was not the proper way to qualify an expert; and the respondent excepted. Undoubtedly the respondent was entitled to qualify the witness as an expert on gases if he could, but in view of the witness' previous testimony and the court's discretion as to the conduct of the examination, we think it incumbent upon the respondent to show by argument or citation of authority that the exclusion of the question as framed constituted an abuse of discretion. This the respondent has not done.

Neither is it apparent how such evidence, if received, would have been material. Our attention is not called to any defect in the apparatus that might reasonably account for the fire.

McClure was asked if in his experience fires arise in electrical wiring and upon objection being made the respondent offered to show that a fire in electrical wiring may occur due to imperfections in the wire, due to short circuits, due to compression of the cable or due to a breaking of the wire in the cable causing an arcing, and that such fire, such arcing or short-circuiting will set fire to the covering of the cable, and will generate enough heat to set fire to wood and to ignite inflammable gas. The question was excluded as the evidence then stood, and the respondent excepted. The witness was then asked: "May a short circuit occur in a cable between a fuse and a motor and not blow a fuse," and the question was excluded. In his brief upon the exclusion of this question the respondent relies upon his offer in the previous question.

Roy Gorham, improved as an expert witness by the respondent, was asked: "May a motor, in your experience, become heated because of mechanical defects?" Upon objection being raised, the respondent's counsel stated, "We are seeking to show, of course we can't show except by inference, that this motor overheated, or that wire short-circuited; but the mere fact that nobody was down

there before the fire to see whether or not it was overheated doesn't prevent it from having occurred; and if it is an efficient cause of fire we think we should have a right to show it to meet the State's case—that is, to show that there may have been one or more efficient causes of this fire, and we think this evidence has that tendency. The question was excluded as all speculation. In his brief the respondent argues, in effect, that because the State has the burden of showing beyond a reasonable doubt that the fire was incendiary and did not occur because of some accidental cause, he was not bound to show that the fire resulted from an accidental cause, but, to meet the State's case, he was entitled to show that it might have so resulted, as tending to raise a reasonable doubt.

 We have held that the mere fact of the burning of a building is not sufficient to establish the corpus delicti, for if nothing more appears it will be presumed that the fire was the result of accident or some providential cause, rather than the result of a criminal design. *State* v. *Lizotte,* 109 Vt 378, 385, 197 A 396; *State* v. *Baker,* 115 Vt 94, 97, 53 A2d 53. Stated a little differently, in order to prove the corpus delicti of arson it is not sufficient to show a burning, which may have been the result of an accident. It must be proved beyond a reasonable doubt that the burning was not accidental, but was wilfully and maliciously caused by some person who was morally responsible for his actions. Underhill's Criminal Evidence, 4th Ed., § 616.

 The contention of the prosecution that the burning was of incendiary nature may be disproved by the accused, any evidence otherwise competent being admissible to show that the fire was of accidental or providential origin. Curtis, The Law of Arson, § 296. Curtis cites in support *State* v. *Delaney,* 92 Iowa 467, 61 NW 189, where it was held that the respondents should have been allowed to show that the building in question contained a gasoline stove which leaked gasoline on the floor, and had once caught fire. The court stated that the entire evidence as to the respondent's guilt was circumstantial and that they were entitled to the benefit of any legitimate testimony which might throw any light upon the cause of the fire, and that if a fire had once caught from this cause, it was proper to show it as tending to account for the fire in question. Also *Hamilton* v. *People,* 29 Mich 173, a case of a burned barn, where the court were of the opinion that the respondent should have been allowed to show that persons were in the habit of playing cards

in the barn and used lights, since the fire might have taken place from such a cause, and the defense was entitled to show all circumstances reasonably bearing on such a possibility.

██ ██ Here there was direct evidence as to setting the carton of crepe paper on fire, and assuming this evidence is believed, the only question is whether under the circumstances disclosed it can be inferred beyond a reasonable doubt that the building did not catch fire in the way it did at the time it did from some accidental or providential cause, but did catch fire from the burning carton of crepe paper. The respondent offered no evidence tending to show that suitable electrical equipment properly installed and maintained is inherently likely to cause a fire. Up to the time the excluded questions were asked McClure and Gorham, no evidence had been offered tending to show any defects in the motors or wiring. Opinions must be based on facts disclosed by the evidence in the case and not in whole or in part upon speculation of the witness as to what might have been such evidence. *Bliss* v. *Moore,* 112 Vt 185, 190, 22 A2d 315, and cases cited. To meet the State's case the respondent was entitled to show, as he subsequently did, defects in the motors, wiring and fusing that might reasonably account for the fire. Evidence that the fire might have resulted from some undisclosed defect in the motors or wiring affords only a basis for conjecture as to the existence of any such defect, and conjecture is no proof in him who is bound to make proof. *Wellman, Admr.* v. *Wales,* 97 Vt 245, 255, 122 A 659; *McKirryher* v. *Yager,* 112 Vt 336, 341, 24 A2d 331. The offered evidence was properly excluded.

The respondent offered as exhibits the base, condenser and a compressor which were in the basement near where the fire started, upon the ground that if the fire had started in the manner in which the State claims it did, there would have been a complete burning of the shelf or bench upon which they rested and that they would show more evidences of fire than they did, and the court, remarking that they had been cleaned up, excluded them subject to exception.

After the fire the top of the shelf or bench under the motors was found to be charred somewhat, the copper tubing to the two compressors was broken open, and the offered base, condenser and compressor were wet from the water used in putting out the fire, and there was more or less soot and ash on them. After the fire

the motors, compressors and other equipment were taken apart and removed, and one of the compressors was junked and the motors were disposed of. When offered the exhibits were dry and the soot and ash had been removed, and they had been cleaned up somewhat. Our attention has not been called to any evidence indicating to what extent the offered exhibits showed the effect of fire other than what they show themselves.

■■■ The determination of whether physical objects should be admitted in evidence is in the first instance within the discretion of the trial court. 22 CJS, Criminal Law, § 708, p. 1202. Ordinarily a preliminary question is whether the thing offered is in substantially the same condition it was at the time in question. The determination of this fact is for the trial court, and to its findings exceptions do not lie, except in the case of an abuse of discretion. *Thompson* v. *Columbian Nat. Life Ins. Co.*, 114 Me 1, 95 A 229. It would seem that the soot upon metallic objects, like the offered exhibits, would be some evidence of fire under the circumstances. Since the soot and ashes had been removed we cannot say that the court abused its discretion in excluding the objects. This exception is not sustained.

Bertram Bixby, a witness of limited mentality, was called by the State, and having testified to going to respondent's store with De-Forest on the night of the fire, and to a conversation there between the respondent, DeForest and himself, in which the respondent said it would be a good night to have a fire and DeForest said he was going home on the train that night, was asked if he recalled anything else of the conversation, and he answered "no." He was then asked if that was the first time he had heard any discussion between the respondent and DeForest about a fire, and he answered "yes." He was then asked "All right, was there anything further said that night at the time of this conversation as to what would be done for Mr. DeForest or for yourself?," and he answered "yes," and he was asked "What was it?" and the respondent objected "he said he told us all the conversation," and the court said "we will take the answer" and allowed the respondent an exception, and the witness answered "He said he would make DeForest manager of the store and he would get me a job with his father-in-law." He was then asked, "Are you sure, Bertram, that that is the first time that you have heard any discussion, or been a part of any discussion, between Teitle and DeForest and yourself about a fire?" and the respondent

objected "it has already been asked and answered twice," and the court said "we will take the answer, and you may have an exception," and the witness answered "no," and in answer to further questions testified that a previous discussion took place, and that he thought it was in the back room, and that he recalled no more than one previous discussion.

The respondent now argues that because the witness was an accomplice any testimony from him was subject to suspicion, and that to permit the State to pursue the examination in its effort to corroborate DeForest, the other accomplice, after the witness had twice testified that there was no further conversation was highly prejudicial to the respondent and error. As shown in *State* v. *Dana,* 59 Vt 614, 618, 619, 10 A 727, the statements of an accomplice should be received with great caution, yet such testimony, if believed by the jury, will warrant a conviction. The State occupies a different position to a witness it calls than that of a private party, since it is the duty of the State to produce and use all witnesses within reach of process, of whatever character, whose testimony will shed light upon the transaction under investigation. *State* v. *Slack,* 69 Vt 486, 491, 38 A 311; *State* v. *Searles,* 108 Vt 236, 239, 184 A 701. Hence it may, in the discretion of the court, cross-examine a witness, ask leading questions and repeat a question already answered. See *State* v. *Fairbanks,* 102 Vt 283, 292, 147 A 682. In ordinary cases leading questions are within the discretion of the court. *Re Estate of Martin,* 92 Vt 362, 366, 104 A 100. And where a witness is of limited mentality, immature or unable to bring to mind the fact in response to the stimulus of a question in the customary form, or for other reason difficult to examine, the court may permit counsel to bring out what his witness knows by questions which involve such a degree of suggestion as appears to be necessary. This should be left for the most part to the wisdom and discretion of the trial court instead of being restricted by the mechanical operation of inflexible rules. *Guiffre* v. *Carapezza,* 298 Mass 458, 11 NE 2d 433, 125 ALR 1. This exception is without merit.

Continuing the examination Bixby was asked if at sometime during that evening or night he and Teitle and DeForest went to the cellar of the store, and he answered "yes," and the respondent objected stating, "The witness is now testifying to very material matter and he should go forward with his story and not be led" and

the court replied, "Yes, that is true, and from this point on be very careful, Mr. Prosecutor," and allowed the answer to stand. The witness was then told to tell what happened in the cellar and he replied, "We went down stairs, and there was a big box of crepe paper there, and Teitle lit two or three matches, and we threw our cigarettes in and see that the fire caught, and come up stairs." After some further questioning about details of his answer, he was asked if the cigarettes were lighted, and answered "yes", then he was asked, "You came up stairs, you say?" and he answered "yes" and respondent's counsel remarked "The witness should go forward with his story" and the court stated, "Proceed with the examination" and the question was in substance repeated and again answered "yes." He was then asked to tell what happened and what he did, and then was asked where the box of crepe paper was located, and replied that it was in the east side, near some compressors, and later was asked if the compressors were on something, and he guessed they were on a shelf. He was then asked if it was a wooden shelf, and he thought it was. He was then asked if there was something on that wood, and he didn't remember. He was then asked, "Do you remember talking with Mr. McShane and myself last evening?" and he replied "yes." He was then asked, "Do you recall telling Mr. McShane and myself that there was oil on that shelf?" and he answered "yes." He was then asked, "Was there oil on that shelf, sir?" and he replied, "I am not positive." He was then asked, "But you are positive that you told Mr. McShane and myself so last night?" and the question was objected to and excluded. He was next inquired of about coming up the cellar stairs and about the order in which the three came up, and about going out the front door. He was then asked if he saw Teitle go toward his car, and he answered "yes." He was then asked if at some later time he heard the motor of that car start, and the question was objected to as leading, and was waived. We have not quoted all the questions and answers given in the long excerpt from the transcript and quoted in respondent's brief which shows several other leading questions, to which no objection was made and which by themselves seem unobjectionable. The respondent argues that the State persisted in offering evidence that had been ruled out and persistently and deliberately ignored the Court's caution, and that it was particularly harmful, since it was the only evidence in

the case corroborating DeForest as to the actual setting of the fire. We are unable to see any persistent or deliberate attempt on the part of the State to evade any ruling of the Court that brings this case within *Rudd* v. *Rounds,* 64 Vt 432, 441, 25 A 438; *State* v. *Felch,* 92 Vt 477, 487, 105 A 23, or *Niebyski* v. *Welcome,* 93 Vt 418, 422, 108 A 341, cases cited by the respondent. This exception is not sustained.

In his direct testimony the respondent testified that after closing his store around midnight on the night of the fire he had a talk with Harold Coakley about going fishing in which Coakley asked him if he still had his mother's fishing rod, and he told him he did, and they talked about where they were going to go, and so forth. The respondent was then asked "Where were you going to go?" and the question was excluded subject to exception. Then the respondent was allowed to again state that they talked about where they were going to go, but that they didn't fully reach an agreement, and that there was talk about going Sunday, and then the respondent again offered to show where they planned to go, stating that it is only fair that he be permitted to tell the whole story, and the same ruling was made and the court said "They had some talk about fishing, that certainly identifies it." All that the respondent says in his brief is that the fact that the respondent had a talk with Coakley was a vital step in proving the respondent's alibi, and the court should have permitted all of the conversation to come in, as the details of a conversation such as this would have tended to strengthen the effect of the testimony of both the respondent and Coakley in establishing the alibi. The fact that the respondent and Coakley had a discussion about going fishing might have aided the respondent in fixing the time and place where he saw Coakley. *Wilkins* v. *Metcalf,* 71 Vt 103, 109, 41 A 1035. It is difficult to see, however, how the details of where they planned to go fishing have any bearing upon establishing such time and place. We will presume that the court in the exercise of its discretion excluded the question as being too remote in point of logical relation to the issue on which it was offered. *Dalpe* v. *Bissette, supra.*

The respondent, having testified that the store was given to himself and wife about July 1, 1946, and that afterward it was remodeled and new equipment installed before the fire, and having produced and identified a number of invoices and purchase agree-

ments for new equipment, and that he had made a diligent search for additional invoices or purchase agreements and could not find any, was asked "Will you tell the jury why you have experienced, or did experience, some difficulty in locating the invoices or purchase orders?" The question was objected to and respondent's counsel stated: "We offer to show that following the fire his papers and records were in disorder, and that while he made search for bills, that he was unable to find them. Now we don't want any inference drawn here that because this man can't produce these bills, that he is telling an untruth about them." The question was excluded subject to exception.

It is the general rule that when evidence peculiarly within the knowledge of a party is not forthcoming, an inference unfavorable to such party may be drawn from his failure to produce it. *Pacific Lumber Agency* v. *National Aircraft Materials Corp.*, 108 Vt 10, 17, 182 A 192. Although undisputed parol testimony was later received of purchases for which the respondent could not find invoices or purchase orders, including installation costs, he was entitled, in answer to proper questions to testify as to where he had kept the lost papers and to the circumstances tending to show that they could not be found and produced, in order to rebut such inference. "Disorder" means "Want of order, confusion, disarray as, * * * the papers are in disorder." Webster's New Int. Dictionary. If respondent's papers and records were merely in disorder after the fire, according to his offer, it would seem that he could not find the missing invoices or purchase orders except by going to the trouble of separating them out. The offer was sufficiently equivocal to make it impossible to see how it would have any tendency to rebut such inference. Error is not made to appear.

During the cross-examination of the respondent he was asked, "Well, you take bets on the races there, don't you?" His answer, "We do not" was taken over objection. In his brief he states that this line of inquiry was immaterial, and was introduced for the purpose of prejudicing him before the jury by attempting to show that he committed another crime. We will assume that the court received the answer as bearing on the respondent's credibility as a witness, but need not decide its admissibility. It is impossible to see how, in view of the answer, respondent could have been harmed, and we fail to find prejudicial error.

The respondent testified about David Dolgin awakening him on the night of the fire and telling him that his store was on fire, and that he told him to quit kidding him because they were always fooling with one another. Later David Dolgin testified to telling the respondent that his store was on fire and that the respondent told him he was kidding and to go away, and he replied, "No kidding, I really mean it." He was then asked, "Is it a habit of you and Mike and the rest of the boys to do some kidding?" Upon objection being made, respondent offered to show by this witness, as explaining the remark of Mike, "You are kidding," that there had been a lot of kidding and horse play in the past between this witness, the other brothers and the respondent. In his brief he claims that the evidence was admissible as tending to corroborate the testimony of the respondent about the witness' visit to his apartment. Since this reason was not advanced below we do not consider it. Error does not appear.

David Dolgin was asked what he did after he finished his conversation with the respondent, and he replied, "The phone rang and my dad called ———" Upon objection being made the court said, "Yes, you needn't give any more talk." The witness again testified to hearing the telephone ring, and that the respondent answered, and that he heard a part of the conversation. He was then asked "Could you tell from the conversation with whom he was talking?" and the question was excluded. The respondent here says that he was entitled to have his version of what occurred at that time corroborated by the witness, but he does not tell us of any testimony which he claims should be corroborated. This is inadequate briefing. Furthermore the answer of the witness that his dad called was left in the record, so he was not harmed by the exclusion of the question.

Irene Teitle, respondent's wife, having testified that in the early morning of the fire her brother David Dolgin banged on the door and that she heard him telling the respondent about the fire, was asked, "What conversation, if any, Irene, did you hear between your brother David and Mike?" This was offered to corroborate the testimony of David and the respondent as to their conversation at that time, and to show that the respondent thought David was kidding him about the store being on fire. As previously noted a litigant cannot corroborate himself and his witness

by showing extra-judicial acts, conduct or statements having that tendency.

During the closing argument for the State Mr. Black, the special prosecutor, stated: "Brother Longmoore suggested to you that this was an important case as far as this respondent is concerned. What you ladies and gentlemen do in this case will be watched and observed." The respondent objected to the last sentence, and upon the ruling of the court that the argument was proper, Mr. Black further stated: "What you do will be observed generally by people of this county and will be observed generally by the law enforcement agencies of this county and the State generally." The respondent excepted to this and the court stated: "The court might say to you what all juries do is to be watched by the public. That is all that is being argued to you. We think the argument is proper" and allowed an exception, and Mr. Black stated, "In view of the court's statement, I think it unnecessary to go into that subject any further."

We see nothing in the argument calculated to arouse the passions and prejudice of the jury or a fear in them of disapproval by the public or law enforcement agencies, as suggested by the respondent. It is unlike the argument used in *Citizens Savings Bank & Tr. Co.* v. *Fitchburg Mutual Fire Ins. Co.*, 86 Vt 267, 276, 84 A 970, 973, cited by the respondent, where plaintiff's counsel stated: "I submit to you that every father and every mother, and every business man, who knows about this law suit, is watching, is listening, and will inquire what the jury does with the insurance company." That argument tended to prejudice the jury against the defendant because an insurance company. The statements of Mr. Black were prompted by the argument of respondent's attorney and merely pointed out that the case was important to the public as well as to the respondent, and meant no more than an appeal to the jury to perform their duty and see that justice is done. In *State* v. *Marini*, 106 Vt 126, 144, 170 A 110, 117 the State's attorney stated: "It is true you can't bring Alberta back, but you can see justice is done" and the Court saw nothing improper or prejudicial, stating: "Counsel for the State are entitled to some latitude in the argument of a case as well as counsel for the respondent." Error is not made to appear.

214

During further argument by Mr. Black the transcript shows the following to have occurred:

"MR. BLACK . . . 'Now first of all if that motor could have caused a fire at the time of this fire, why didn't it cause a fire at the time previously when it was out of order? Has anyone explained that to you? You will recall that Mr. McLean said that if this defect were to cause a fire or to appear again, it would have occurred within a month or sooner.'

MR. WITTERS: I think, if the Court please, that is a mis-statement of the evidence. Mr. McLean said it might have occurred within a month or even sooner.

THE COURT: Your memory is controlling, and if at any time you should desire to see the record, you may have it read to you.

MR. BLACK: We will stand on that statement, that he testified it would have occurred within a month or sooner, but it didn't occur within a month or sooner. I am not very good at mathematics but I can understand that.

MR. WITTERS: We except to this argument that the condition did not occur within a month or sooner, because there is no evidence in the case as to the condition of—the condition Mr. McLean testified about at any time after he reinstalled the motor, and particularly at the time of this fire.

THE COURT: We will allow the argument, you may have an exception to the Court's ruling.

MR. BLACK: I stand on that proposition that this fire did not occur within a month or sooner of the time Mr. McLean's man reinstalled that motor. Is that satisfactory?

MR. LONGMOORE: That was not the argument, the argument was the condition of the motor."

McLean testified that he repaired the motor referred to in July or August prior to the fire, that he found the commutator pretty much burned and pitted, the brushes burned and the solder out of the commutator; that the cause was an overload; that an

overload causes heat, and that under defective conditions sufficient heat will be generated to cause the motor to burst into flames; and that if the conditions continued, that caused the motor to be in the condition he found it in, he would expect the same defect in it would recur. In reply to the question as to whether he had an opinion as to the time in which it would recur, he answered, "We have had many of them happen within a month, sometimes even sooner." All that respondent now says is, that this testimony is a far cry from the argument that, "If this defect were to cause a fire or to appear again, it would have occurred within a month or sooner." The exception taken to the second quoted statement by Mr. Black is not briefed, and so is waived.

██ Our practice relative to taking exceptions to an argument is not affected by V. S. 47, § 1628. Merely to state an objection thereto, without taking an exception, is not enough. *Stoddard & Son* v. *Village of North Troy,* 102 Vt 462, 467, 150 A 148, and cases cited. Here the respondent's counsel did not even object to the first quoted argument by Mr. Black, but merely made a statement. Consequently nothing is before us for review.

Had the respondent excepted in the language used, it is not shown that he was prejudiced by the argument. The fault pointed out below was the use of the word "would" instead of "might." Both sides misquoted McLean's testimony and neither interpreted it correctly. Leaving out the words "to cause a fire" to which no objection was made below, had Mr. Black said it would "very likely" or "probably" have occurred within a month or sooner, he would have expressed what McLean meant with sufficient accuracy. It is not a case where like trouble with one or two motors had recurred within a month, and so might recur in this motor within that time, it is a case where the trouble had recurred in many motors within a month or sooner. Had Mr. Black and the Court been advised correctly as to what McLean testified, the mis-statement might have been corrected. The court told the jury that their memory of the testimony was controlling, and after further objection Mr. Black modified his stand, as indicated in the quotation from the transcript. In view of the defense that the fire might have been caused by the defective motor, it would seem to have been to the advantage of the respondent to have it appear that the defect *would* have recurred within a month or sooner, and so before

the fire, rather than that it *might* have recurred within that time.

During the argument of the State's attorney exception was taken to his statement that the State had produced two witnesses who saw the respondent at the scene of the crime, and that one of them was Miss Young, because the evidence was that she did not identify the respondent and could not tell whether it was man or woman. The court told the State's attorney he should straighten that out, and upon an exception to the remark being requested, the court replied: "We think the remark as made is not improper, provided it is properly qualified," and the court allowed an exception to the ruling but not the argument. Then the respondent again excepted to the argument, and the court said "Very well." Immediately thereafter the State's attorney stated, as shown by the transcript:

> "Mr. McShane: 'Let us refer to the testimony of Miss Young. She tells us that at approximately quarter of one she left her residence on Cherry St. for the purpose of taking the train south from St. Johnsbury that night. She states that she came out onto Eastern Avenue; she walked down on the north side; that at the time she got approximately in front of McKenzie's restaurant she noticed a light go out in the Eastman drug store building; she noticed a person leaving the store; she noticed that person go to the alleyway immediately west of the drug store building and start to get into an automobile there parked.'"

This statement was made to straighten the matter out as directed by the court, and plainly showed all that the State claimed that Miss Young's testimony tended to show. If the statement was unsatisfactory to the respondent he should have pointed out wherein it was incomplete or incorrect, and, for failure to do so, the court and State's attorney had the right to assume that any error in the original statement had been cured. No reversible error is shown. See *French* v. *Nelson,* 111 Vt 386, 389, 17 A2d 323; *Button* v. *Knight,* 95 Vt 381, 385, 115 A 499.

Referring to the shelf and motors and to the trial of the case of *Teitle* v. *The London and Lancashire Ins. Co. Ltd.,* 116 Vt 228, 73 A2d 300, the special prosecutor said: "In this other trial apparently it served his purpose better to say that there was burning above and below, but at this trial it served his purpose much better

to have it burned above only." Respondent's counsel then stated "We object to the argument that in this trial it served his purpose better to have it burned above the motor only, because he testified and the most of his witnesses, if not all of them, they noticed there was scorching or burning on the shelf which was below the motor." The respondent was the first witness to testify in his defense. In his direct examination he testified that in the morning after the fire he went down into the basement of his store and observed that the fire seemed to have originated just above the motors in a fan type shape up to the ceiling, and that the bench or platform on which the motors and compressors set was not burned, and that there was no burning below the platform. On cross-examination he testified that there was some charring on top of the shelf, but he didn't recall if there was any evidence of burning under the motors. Upon having his attention called to his testimony at the trial of his insurance case, he testified that the shelf under the motors was charred, and that at the former trial he testified that there was evidence of fire actually burning above and below the motors. It may be that it was the fault of counsel in not having the respondent bring out in his direct examination the fact that the top of the shelf was charred under the motors, on the other hand had this not been brought out on cross-examination respondent's other witnesses might not have been interrogated relative to it. We cannot say that the argument was unwarranted. Error is not shown.

Relative to taking the last exception briefed the transcript shows the following:

"MR. BLACK: Now these blue prints * * * at the station that night when he was asked if he had any blue prints what did he say—he said 'No' isn't that pretty significant? Doesn't that have some bearing on whether or not this man is guilty or innocent?

MR. WITTERS: We would like an exception to the argument 'at the police station he said he didn't have any blue prints.'

MR. BLACK: We will stand on that proposition, we have examined the record and we find that was his testimony.

THE COURT: You may have the record read to you on that point if you find you need to have it when

you come to consider the case. It is a matter for your recollection."

In his brief the respondent broadens his ground of exception by calling our attention to the transcript showing that he was asked if he ever had any blue prints made for a new drug store, and showing the testimony of Mr. Dolgin, respondent's father-in-law, that he was the one who had the plans made. An exception to an argument claimed to be improper, must not only state the language objected to, but also specifically the ground of objection, so that the court may know upon what it is called to rule. An objection that an argument is improper, without informing the court in what the alleged impropriety consists, is not sufficiently explicit to apprize the court of the real point of it. No reason for such an exception except that stated in taking it will be considered in review. *State* v. *Schoolcraft, supra* and cases cited. There was evidence that before the fire the respondent showed one witness blue prints for enlarging the block and making a bigger store, and another witness blue prints or sketches for that purpose, and that he told a third witness that he was going to extend the block out to the sidewalk. In view of such evidence it can readily be seen that Mr. Black, despite his insistence, might honestly have been mistaken. Had respondent's counsel then pointed out what he now shows, it is not improbable that the argument would have been withdrawn or corrected. Fairness to the court, and to the opposing party, requires the exceptant to disclose the defect relied upon. *Miles* v. *Vermont Fruit Co.,* 98 Vt 1, 16, 124 A 559. The exception is unavailing.

*Exceptions overruled and judgment affirmed. Let execution be done.*