Maryland Casualty Company
v.
Everett L. Heald, Stephen Heald,
Raymond W. Heald, Elizabeth Gillilan,
Administratrix of the Estate of Philip Arnold,
Hartford Accident & Indemnity Co.,
Merchants Mutual Insurance Co., and
Stephen B. Collins, Administrator of the
Estate of Newell Parker

[211 A. 2d 177]

April Term, 1965

Present: Holden, C. J., Shangraw, Barney, Smith and Keyser, J. J.

Opinion Filed June 1, 1965

*Wick, Dinse & Allen* for plaintiff.

*Albert W. Coffrin* and *Douglas C. Pierson* for defendant.

Hartford Accident and Indemnity Co.

*Leary and Leddy* for defendant Merchants Mutual Insurance Co.

**Keyser, J.** This is a proceeding for a declaratory judgment in equity relating to the respective obligations of plaintiff, Maryland Causalty Company and defendants Hartford Accident & Indemnity Company and Merchants Mutual Insurance Company, under certain automobile liability insurance policies issued by each company. On the findings of fact, the court declared the plaintiff and Merchants

were primarily liable on specified policies (1) equally to defend one Stephen Heald in a suit brought against him in Federal court and (2) on a 2/3rds (plaintiff) - 1/3rd (Merchants) basis as to damages arising out of said suit up to the limits of the policies. Other provisions of the judgment order are immaterial as the case is here on appeal by the plaintiff.

Two questions are raised by plaintiff. It claims (1) the use of the 1949 Cadillac was not a hazard insured against in the Maryland garage liability policy and (2) Stephen Heald (operator of the Cadillac) was not an insured under the Maryland garage policy.

The following material facts are shown by the findings of the chancellor. The plaintiff issued a garage liability policy to defendant Everett L. Heald which included the so-called omnibus clause with coverage of $50,000. Merchants issued its automobile liability policy to Newell Parker, later deceased, with coverage of $25,000. At the time of his death on December 13, 1960, Mr. Parker owned a 1949 Cadillac which he had parked in the Owl's Club parking lot in St. Albans.

Attorney John Kissane of that city, who had drawn a will for Mr. Parker and was his long-time friend, was employed by Mr. Parker's sister the day following her brother's death to handle the estate for the relatives. Defendant Raymond W. Heald, a funeral director, was also present to discuss funeral arrangements. At that time Raymond Heald told Mr. Kissane he might be interested in purchasing the Parker Cadillac. Mr. Kissane made a telephone call and determined the car was worth $50.00.

Sometime between December 14 and 19, 1960, the steward at the Owl's Club requested Mr. Kissane to remove the Cadillac from the parking lot. Kissane did not know whether the car was in operating condition. On either December 19 or 20, Mr. Kissane contacted Raymond Heald, telling him he could have the Cadillac for $50.00 if he wanted it. Heald replied he wanted to try out the car to be sure it would run before he bought it. Mr. Kissane told Heald he had no objection, and go ahead and try it out but not to operate the vehicle with the Newell Parker plates attached to it. Raymond Heald told Kissane he wanted his son Stephen to try it out when he came home from college for Christmas vacation. Kissane also told Raymond if he didn't want it he would sell to someone else.

On the same day of this talk, Raymond Heald and his brother, Everett Heald, a used car dealer, went to the Owl's Club lot and removed the Parker plates from the Cadillac. On instructions of

Everett, dealer plate D-219 issued to him was attached to the car. Each then drove the car for some distance. Everett was very interested in purchasing the Cadillac and selling it at a profit. Raymond intended to replace his 1953 Chevrolet with the Cadillac if he found it satisfactory. It was understood between Raymond and Everett that if Raymond decided to buy the Cadillac it would be through Everett who would then sell the 1953 Chevrolet for Raymond through his used car business, but if Raymond did not keep the Cadillac, then Everett was to purchase it for use or resale in his used car business. Either way, the deal was handled, Everett would make a profit on it.

The car remained in Raymond Heald's possession and was operated some by him but mostly by his son, Stephen, until December 31, 1960. On that date, Stephen while operating the Cadillac to attend a dance, was involved in an accident which resulted in the death of his passenger, Philip H. Arnold, and a suit being brought against Stephen for damages. The dealer plate with the knowledge of Everett Heald had remained on the car until its removal after the accident. At that time Raymond Heald had not indicated to Everett whether or not he was going to keep the Cadillac. Everett did not have any conversation or negotiation with either Mr. Kissane or the executor of the Parker Estate relative to the Cadillac.

Plaintiff first urges that the use of the 1949 Cadillac was not a hazard insured against in its garage liability policy issued to Everett Heald. That portion of the definition of hazards in the policy which is pertinent here reads as follows:

"Division 1 — Premises — Operations — Automobiles. The ownership, maintenance or use of the premises for the purpose of an automobile dealer, repair shop, service station, storage garage or public parking place, and all operations necessary or incidental thereto; and the ownership, maintenance or use of any automobile in connection with the above defined operations and the occasional use for other business purposes . . .".

The court found (Supp. F. 10) : "The use of Stephen Heald of the 1949 Cadillac sedan was incident to the used car business of Everett Heald." Plaintiff argues this finding is inconsistent with a finding by the court that the operation of the Cadillac by Stephen on December 31, 1960 was for pleasure purposes only and also is not sustained by the evidence. Whether the hazard is covered by the definition depends upon the correctness of the above finding.

Findings must stand if there is any evidence fairly and reasonably

tending to support them. *Murray* v. *Webster*, 123 Vt. 194, 196, 186 A. 2d 89. And we must read the evidence in support of the findings, if reasonably possible, when considered as a whole. *Little* v. *Little*, 124 Vt. 178, 182, 200 A. 2d 276.

Under the definition of "hazard", quoted supra, it is clear that the use of any automobile, whether or not it was owned by Everett Heald, is embraced within the definition as long as the use of the car was in connection with Mr. Heald's business as an automobile dealer.

The evidence establishes that Everett Heald's connection with the Cadillac was as an automobile dealer. When Everett and his brother, Raymond, went to remove the Cadillac from the Owl's Club parking lot, he attached his dealer plate to the car. He then drove it, and became very much interested in buying it, knowing the price was $50.00. Everett and his brother, Raymond, made the arrangement that Raymond was to try out the Cadillac and if satisfactory he, Raymond, would buy it. Raymond owned a 1953 Chevrolet which his daughter and son, Stephen, used and the Cadillac was to replace that car. Everett was to have the Chevrolet to sell if Raymond bought the Cadillac and, if he didn't Everett was to have the Cadillac to sell. Either way, it was a business transaction from which Everett would realize a profit. Further, Everett knew Stephen Heald was coming home from college for Christmas vacation and would be driving the car to try it out. And, Everett's dealer plate remained on the car until after Stephen's accident.

The unlimited control and possession of the Cadillac was placed unconditionally with Raymond Heald, excepting that it was not to be driven with the Parker registration plates attached. Thus, the representative of the owner ratified whatever arrangement Raymond Heald made for the attachment of other registration plates. This was blanket authority to Raymond Heald; and the arrangement he made was one which Mr. Kissane must have anticipated since Raymond could not legally place his own registration plates short of ownership of the vehicle.

Whether or not Everett Heald had authority directly from the actual owner of the Cadillac to put his plates on it and thus take control of the vehicle as he did, is immaterial in the present case since the defined hazard is "use of any automobile." And there is no limitation or exclusion, in the definition which necessitates that the use be by the direct authority of the legal owner of the vehicle.

Permitting Everett to attach his dealer plate on the car, which

Raymond had the authority to do, shows Raymond unequivocally placed the Cadillac under Everett's control. From what Mr. Kissane said to Raymond, he had the right to do exactly as he did. Raymond testified that if he kept the Cadillac it would be bought through his brother Everett. Everett had the right to place his plates on the car and let them remain there provided it was a business deal. From this, there is a strong inference that the transaction was incidental to and connected with Everett Heald's used car business.

The finding challenged by plaintiff has ample evidentiary support and must stand.

The plaintiff also argues that this finding (Supp. F. 10) is inconsistent with a finding that the use of the Cadillac by Stephen Heald was for pleasure purposes only. We are unable to accept this contention. The use by Stephen was an unrestricted and authorized use. "Use" must be interpreted in the ordinary sense. Stephen was trying out the car with the knowledge of his uncle Everett whose dealer plate was on the car and who was looking to make a profit out of the deal. Stephen's pleasure use of the Cadillac constituted at the same time a business use since it had a relationship to Everett's business and was one from which a benefit was to accrue to Everett. Thus, whether Stephen was using the car for pleasure purposes is immaterial. Regardless of the use he did make of it, pleasure or business, we hold it was within the scope of the definition of "hazard" in Everett Heald's garage liability policy since it was a "use of any automobile in connection with" Everett's business as an automobile dealer. The finding of the chancellor brings the "hazard" in question within the meaning and effect of its definition in the policy.

The second question for consideration is plaintiff's claim that Stephen Heald was not an insured under the Maryland garage policy.

So far as material here, this policy defines "insured" as follows:

" . . . any person while using an automobile covered by this policy, and any person or organization legally responsible for the use thereof, provided the actual use of the automobile is by the named insured or with his permission."

This is the standard omnibus clause and extends coverage to persons other than the named insured. No general rules of any kind can be formulated which would guide in the construction of garage liability policies because of the great varations in the wordings of the policies and differences in the factual situations involved in the individual cases.

In *American Fidelity* v. *North British,* 124 Vt. 271, 204 A. 2d 110, Justice Barney after discussing rules of construction respecting the omnibus clause of an insurance contract, said at page 273:

"It is, therefore, usually best for courts to meet the issues completely on a case by case basis, leaving classification to others, limiting the use of general propositions to those that are essential to an understanding of the manner in which the court resolved the questions involved, and the way it will approach others like it."

Justice Barney further said at pp. 273, 274:

"Since the object of the insuring agreement is the assumption of tort liability which is expected to arise out of circumstances beyond the mutual control of the contracting parties, too narrow construction may defeat the purpose of the agreement. It is because of such considerations that most courts give a broad, rather than a narrow, construction to liability policy language. *Harte* v. *Peerless Ins. Co.,* 123 Vt. 120, 124, 183 A. 2d 223. Since these liability policies are drafted by the insurer, it is not unreasonable, having in mind that the policies are sold as shields against liability claims, to construe the terms of the agreement as broad as its intended purpose, and giving its language appropriate breadth of meaning."

The question of liability is controlled by the proper construction to be given the language of the policy defining "hazard" and "assured." We find little authority either way to assist us upon the precise question which fits into the factual situation presented in this case. The object of the insurance contract would be defeated by a strict construction. This is not the course adopted by this court in *American Fidelity* v. *North British,* supra. Here, as there, we give the policy language a broad, rather than a narrow, construction.

Whether Stephen Heald was an "insured" under the definition stated in the policy, he must have been operating a vehicle covered by the policy with the permission of Everett Heald, the insured. This is admitted by plaintiff in its brief. We have determined, supra, that the Cadillac operated by Stephen on the fateful night was covered by the policy. It only remains to consider whether it was being operated by permission of Everett Heald, principally a factual question.

The court found (F. 38) that "Everett Heald told Raymond W. Heald to have Stephen, Raymond Heald's son, drive the 1949 Cadillac and if it was all right he could keep it and if 'Ray' did not want it, he could bring it back to Everett as he knew he could sell the car and make

a dollar." The plaintiff says this finding is not supported by the evidence.

Defendant Everett Heald testified on cross-examination by counsel for Hartford as follows:

"Q. At the time that you and your brother took the Cadillac up at the Owl Club parking lot you knew Raymond's son Stephen was then coming home from college for the Christmas vacation?

A. Yes.

Q. And did you tell your brother to take the car for the Christmas vacation and let Steve try it out and see if Steve might want it, might be interested in buying it — strike the question, I will try again.

A. Yes.

Q. And further, that if your brother was not interested in buying it, then you definitely would be interested in buying it?

A. Yes."

Plaintiff takes the position that the second question was struck by the examiner. However, there was no ruling by the court and, for whatever reason, the witness did answer the question. The answer was accepted by the court and by all parties concerned without objection. There was no action taken to erase it from the record and the examination then continued. From what transpired we can only assume that the evidence elicited by this question and answer was allowed to stand and remain in the case for all purposes. This testimony was for consideration by the trier of fact and it is evidentiary support for the findings excepted to by plaintiff.

Plaintiff objected to the admission in evidence on behalf of Merchants of a written statement given by defendant Everett Heald to the adjuster of Merchants. Merchants argues that evidence of actual permission by Everett to use the Cadillac appears in this exhibit. The objection made was that the statement was full of opinions not otherwise admissible but just what plaintiff claimed these were does not appear in the record. The court erred in admitting the exhibit. Although this witness was then under cross-examination, the apparent reason for the offer was to corroborate the testimony of the witness by his written statement given out of court. This cannot be done. *State* v. *Teitle*, 117 Vt. 190, 198, 90 A. 2d 562. Also under the circumstances shown, it was not the "best testimony" of what the witness knew. See *Riley* v. *Naylor*, 179 Md. 1, 16 A. 2d 857.

Our examination of the exhibit and the transcript of the evidence discloses that the substantial part of what is stated in the exhibit had been elicited from the witness at the itme the court ruled on its admission. No finding is based solely on anything the witness said in the statement. Prejudice to the plaintiff by the ruling of the court is not made affirmatively evident and consequently would not warrant a reversal. *Colson* v. *Highway Board*, 122 Vt. 392, 398, 173 A. 2d 849. This exception is of no avail to the plaintiff.

We held in *American Fidelity Company* v. *Daniels*, 122 Vt. 14, 163 A. 2d 617, an insurance contract case, that "permission" implies the right of refusal; in *Didlake* v. *Standard Insurance Company*, 195 F. 2d 247, that the words "consent" or "permission" as used in the omnibus clause cannot be the power to withhold as well as grant.

As we have said, the Cadillac was under the control of Everett Heald. Thus, Everett was in a position to refuse or withhold the use of the vehicle with his dealer plate attached or to grant it. He did the latter and consented to let his brother take the car knowing that both his brother and his nephew, Stephen, would be driving.

Everett attached his dealer plate, took possession of the vehicle, drove it, and then relinquished possession of the automobile to his brother with full knowledge of the facts. Certain it is that if this is not actual permission, then in the least it was permission by way of inference or deduction from the facts and conduct of the parties concerned. We think the circumstances shown by the facts in this case leave little or no room for doubt that the required "permission" was present.

This Court must construe the findings so as to support the judgment, if possible, *de Neergaard* v. *Dillingham*, 123 Vt. 327, 330, 187 A. 2d 494. The findings demonstrate that the Cadillac automobile and its use were clearly within the definition of the hazards covered by the policy; and further that Stephen Heald was an "additional insured" under the definition of insured given in the policy. There is no error in the proceedings below and the declaratory judgment order is affirmed.

*Judgment affirmed.*