# State of Vermont v. Frank J. Berard, Jr.

[315 A.2d 501]

No. 44-73

Present: Shangraw, C.J., Barney, Smith, Keyser and Daley, JJ.

Opinion Filed February 5, 1974

*Kimberly B. Cheney,* Attorney General, *William T. Keefe,* Assistant Attorney General, and *Paul F. Hudson,* State's Attorney, for the State.

*Langrock & Sperry,* Middlebury, for Defendant.

**Keyser, J.** The defendant was indicted by the grand jury in Windsor County for murder in the first degree of Raymond Lestage to which he pleaded not guilty. Subsequently, trial by jury in Windsor County Court, at which defendant did not testify, resulted in a verdict and judgment of guilty. Appeal to this Court is mandatory by statute.

Three issues are presented for our decision:

1. Was the admission of evidence of prior crimes committed by defendant error?

2. Was defendant's cross-examination of prosecution witness Linda Badore unduly restricted?

3. Was the exclusion of the 1968 and 1969 State Hospital psychiatric records of Linda Badore error?

On appeal the evidence is to be reviewed in the light most favorable to the prevailing party, here the state, excluding the effect of any modifying evidence. *Mitchell* v. *Amadon,* 128 Vt. 169, 171, 260 A.2d 213 (1969). The evidence discloses the following facts.

The accused lived on North Street in Burlington as did one Ray Rebideau. Prosecution witness Linda Badore lived on Curtis Avenue in Burlington. She had known Berard intimately and Rebideau a few months prior to Saturday, August 12, 1972. The victim, Raymond Lestage, lived in Boston but was in Burlington on August 12th. He had known Berard for years but only met Rebideau and Mrs. Badore at that time. Lestage was to return to Boston that day and the defendant offered to give him a ride. Berard knew the owner of the Ho-Hum Motel in South Burlington and borrowed his 1967 Lincoln Continental, with registration plates Ho-Hum attached, to make the trip.

During the evening of August 12th, the defendant, Rebideau, Mrs. Badore and Lestage spent some time at Jim's Cafe and the Veterans of Foreign Wars Club in Burlington drinking and in conversation. Berard invited Mrs. Badore to ride to Boston with him and the other two men. All four of them left the VFW Club after midnight with the defendant driving the Lincoln. Mrs. Badore rode in the middle of the front seat. Lestage was beside her and Rebideau sat in the rear. The

defendant had a loaded pistol in his belt. Also there was a shotgun in the car which had been picked up by Berard before leaving Burlington.

The defendant drove the car on Interstate 89 to the Bethel exit, then proceeded south on Route 14. After leaving Interstate 89, defendant stopped the car. He and Rebideau got out and went back of the car for a few minutes. Lestage had been bothering Mrs. Badore on the trip and when they returned she asked defendant what she was supposed to do about it. In response defendant told her, "not to worry about it because he was going pretty soon anyway", and he also told her the next time I stop to duck. Shortly, the defendant again stopped the car by a cemetery in Royalton. Lestage awoke and was upset because they had left the throughway.

After an exchange of a few words, Lestage got out of the car and apologized to Rebideau. He then walked a few feet from the car and stood there with his back to it. Mrs. Badore heard a shot and saw Rebideau sitting in the back seat with the shotgun pointed out the car window. Lestage fell forward. The defendant said "wait" to Rebideau, then got out and walked around the car. He told Mrs. Badore if she "was going to be sick to get out of the car, that Lestage was going." He then went to where the victim had fallen. When Mrs. Badore looked again Lestage and the defendant weren't there but were further off and she again heard shots.

During this time, two cars went by. The driver of the first car, who was driving in a southerly direction, saw a car parked by the Royalton Cemetery and stated the first three letters on the number plate were "Ho-H." The occupants of the second car, which was travelling in a northerly direction, identified the Lincoln Continental parked beside the cemetery bearing the number plate "Ho-Hum." As they passed, they reported hearing two or three "loud bangs." This car turned around a short distance up the road, passed the Continental again, and proceeded south to South Royalton.

Defendant returned to the car, got the shotgun from Rebideau and said he "had to finish him." He asked Mrs. Badore to drive up the road, turn around, then come back and pick him up. In doing so she heard one more shot.

After getting into the car defendant remarked that the victim got up and ran after being shot by Rebideau. He asked

Rebideau if this "was his first time out of the gate, his first time shooting anybody or being around where anybody was killed." He replied it was. Defendant then said, "that the first time he'd probably get a little sick" and that "it was the fourth or fifth time for him." Defendant admitted to Mrs. Badore that he fired the shotgun close to the victim's head.

After leaving the scene, defendant drove the car south on Interstate 89. The parties returned to Burlington around 4:30 P.M., Sunday, August 13th, after having travelled to Bellows Falls, Vermont, Claremont, New Hampshire, and Fairlee, Springfield, Proctorsville, Ludlow and Rutland, Vermont. The Lincoln car and the parties were identified in several of these places by the testimony of witnesses.

When Lestage left Burlington with defendant, he had a small suitcase containing personal effects and clothing. The case was thrown out of the car while on Interstate 89 near the Quechee entrance. The suitcase and articles in or near it, found on October 6, 1972, by highway workers, were identified by Mrs. Badore and Mrs. Lestage and introduced into evidence. Also, while the parties were parked in Fairlee, Mrs. Badore discarded a road map and two cups in which coffee had been obtained at a Dunkin Donuts shop in Claremont. These were recovered by the state police with her aid and placed in evidence.

At Bellows Falls Rebideau tried to get a room at a hotel without success. While he was absent from the car the defendant said to Mrs. Badore that he didn't think she realized what had happened. When she said she did, he said, "We just killed a guy. There's a guy dead back there, and I don't think it's hit you yet." She replied that maybe it hadn't.

The victim's body was discovered in the Royalton Cemetery early that morning by a state highway employee which triggered an investigation by the state. There were large gaping wounds in the upper area of his left shoulder and in the back of his head. There were also .22 caliber pistol slug wounds in his buttocks and head.

The shotgun used in the homicide was an old, short-barrelled firearm. It was found in Williston on August 22, 1972, over the bank on Route 2A in the area of the Green Mountain Power Company bridge. The pistol was discovered by Joseph Bartlett in a pile of wood on his property two or three days

after the Lestage homicide. It was owned by a Robert Blanchard, Bartlett's brother-in-law, and given to him by Bartlett. Blanchard told State Trooper Vinton that he had loaned the .22 H & R pistol to Bartlett two or three days before the homicide and when the gun was returned by Bartlett, he told Blanchard that it was used in the Lestage homicide. Ballistics examination proved this to be correct.

Defendant's first claim of error was to the admission of certain testimony of Mrs. Badore given on direct examination.

This witness had testified concerning the events at the scene of the murder. Her interrogation then turned to what transpired immediately after defendant had returned to the car and shortly after leaving the scene of the crime.

The following interrogation took place.

Q. Did he [Rebideau] say anything?

A. He said that Ray Lestage sure had a lot of heart.

Q. Did you hear any response to this comment?

A. Frank [Berard] agreed.

Q. Did he [Berard] say anything else?

A. He said that after Butch [Rebideau] had shot him the first time his arm was just hanging and he got up and ran.

Q. Did he say anything else?

A. He asked Butch if this was the first time out of the gate, his first time shooting anybody or being around where anybody was killed.

Q. What did he say?

A. He said it was.

Q. Did Mr. Berard make any response to this?

A. He said that the first time he'd probably get a little sick. And he said that it was the fourth or fifth time for him.

Without any delay defendant's counsel moved for a mistrial asserting the last statement attributed to defendant was prejudicial and immaterial. The evidence came in without objection and without any attempt to stop the witness even though defendant knew of the alleged evidence. The court denied defendant's motion. No other motions were interposed by defendant at any time respecting this evidence and none have been called to our attention.

A motion for mistrial is addressed to the trial court's discretion, and the denial of the motion will be held erroneous only if prejudice is affirmatively made to appear. *Rash* v. *Waterhouse*, 124 Vt. 476, 477, 207 A.2d 130 (1964) ; *Lewis* v. *Gagne*, 123 Vt. 217, 220, 185 A.2d 468 (1962).

Prejudice must be established by the party claiming it. *Id.* Usually the matter of evidence which is the subject of such a motion calls for such action by the trial court as justice may require. *Lewis* v. *Gagne, supra,* 123 Vt. at 220.

Controlling here is what Justice Barney wrote in *Rash* v. *Waterhouse, supra,* 124 Vt. at 477: "Defendant's standing to argue this issue is compromised by the state of the record, because, by failing to object to the testimony, the defendant waived his right, if any, to have this evidence stricken." Again quoting from the opinion: "As we have seen, the evidence now claimed to be prejudicial and a proper basis for a mistrial, came in without challenge from the defendant. He must, therefore, assume the responsibility for whatever prejudice to his case derived from this evidence."

On the question of prejudice, the record shows that even at the time the motion was made extremely strong evidence already had been introduced in the case which established that the defendant directly participated in the murder of Raymond Lestage. To further show that the declaration objected to did not generate any degree of prejudice, we point to other declarations, or admissions, which later appeared in the record and connect the defendant with the crime. These were also made in the presence of witness Badore, came in without objection and were not disputed. These were: "Lestage is 'going pretty soon' "; "Lestage was going"; he "had to finish him"; "Lestage was a powerful man and the only way he would tangle with him was with a gun"; he "shot him himself"; he "held the shotgun about two inches from his head when he fired it"; "we just killed a guy"; and in talking about pulling a job in Walpole, N.J., said—"You didn't think I got this car and came all this way just to kill that guy."

Contrary to the position the defendant appears to take, this is not a case of a purposeful introduction of evidence to establish other offenses or prior criminal activity by the accused. On the contrary, the state was interrogating

the witness regarding defendant's declarations or admissions made in her presence. There is no indication in the record that the state was reaching to bolster its case, well buttressed with strong evidence against the defendant, by proof of his involvement in any prior crime.

The statement showed the mental condition of defendant and a consciousness of guilt when defendant said "it was his fourth or fifth time."

The record does not support defendant's claim of prejudicial error. Neither does it show that the substantial rights of the accused were offended. The ruling of the court was correct.

The defendant next alleges that the trial court improperly restricted the scope of cross-examination of the state's key witness, Linda Badore. The result of this restriction, according to defendant, is that his right to confront witnesses, guaranteed by the Constitutions of the United States and the State of Vermont, has been violated.

■ The right to confront witnesses is a "fundamental" right which would be binding on the State of Vermont even if our Constitution did not require it. *Smith* v. *Illinois*, 390 U.S. 129 (1968); *Pointer* v. *Texas*, 380 U.S. 400, 403 (1965).

■ As the United States Supreme Court has said:

The primary object [of the right to confront witnesses] was to prevent depositions or ex-parte affidavits . . . in lieu of personal examination and cross-examination of the witness in which the accused has an opportunity not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand in the manner in which he gives his testimony whether he is worthy of belief.

*California* v. *Green*, 399 U.S. 149, 157–58 (1970), quoting *Mattox* v. *United States*, 156 U.S. 237, 242–43 (1895). See also *Mancusi* v. *Stubbs*, 408 U.S. 204, 211 (1972).

■ The right to confront witnesses and to cross-examine is not absolute. The constitutional right to confront witnesses

is an adoption of the common law on the matter. Insofar as this right covers cross-examination, it is subject to the common law exceptions and limitations. 5 J. Wigmore, Evidence § 1397 (3d ed. 1940).

 Cross-examination normally only goes to that which limits, explains, or refutes direct examination or modifies the inferences to be drawn therefrom. The exception is the issue of credibility. *In Re Campbell's Will,* 100 Vt. 395, 399, 138 A. 725 (1927). The credibility of a witness is always open to attack, and wide latitude should be allowed on cross-examination for the purpose of showing who and what the witness is, and that he is unreliable, prejudiced, or biased. *State* v. *Teitle,* 117 Vt. 190, 195, 90 A.2d 562 (1952). It is the scope of this latitude on cross-examination which is here at issue.

██ The scope of this latitude is not unlimited. There are limitations on the questions which may be asked to impeach. Particularly in the area of collateral issues, the trial court may restrict the scope of cross-examination. A collateral issue is one not relevant to any material proposition in the case itself. In the instance of impeachment, the collateral issue would be one bearing only on the credibility of the particular witness and upon which evidence would not be admissible into the case except for question of the credibility of the particular witness. *State* v. *Lapan,* 101 Vt. 124, 134, 141 A. 686 (1928).

The discretion of the trial court in allowing examination on collateral issues apparently depends on the remoteness of that collateral issue.

The *State* v. *Teitle* case, *supra,* presents some interesting similarities to the present case. There the defendant was accused of arson. The key witness was present when the arson was committed and had previously pleaded guilty to a charge of arson. That witness was subject to intense scrutiny on cross-examination, the thrust of which was to show that he was an immoral, unbelievable person. The cross-examination was restricted as to these collateral matters. The questions excluded related to an alleged claim of bigamy and were excluded after 50 pages of extensive cross-examination on other areas. Although stating that the scope of cross-exami-

nation is discretionary with the trial court, and that wide latitude should be allowed on credibility, this Court affirmed the ruling of the trial court. This was on the ground that an abuse of discretion had not been shown, but even if it were, the record did not show harmful error. *Id.* 117 Vt. at 196–97.

In *State* v. *Baril,* 127 Vt. 394, 400, 250 A.2d 732 (1969), a speeding ticket was at issue. The defense sought to cross-examine the arresting officer witness as to the possibility that this arrest was made for the purpose of obtaining a promotion. This line of questioning was excluded at the trial and was upheld on appeal. This Court pointed out that the development of interest or bias of the witness is a right, but apparently felt that this line of questioning was too remote.

Possible hostility of the witness' husband to the defendant was subject of cross-examination in *State* v. *Morrill,* 127 Vt. 506, 513, 253 A.2d 142 (1969). This was excluded and affirmed here, apparently, as being too remote. See also *State* v. *Blair,* 118 Vt. 81, 96–97, 99 A.2d 677 (1953); *State* v. *Aronson,* 111 Vt. 129, 130–31, 11 A.2d 215 (1940); and *State* v. *Schoolcraft,* 110 Vt. 393, 395, 8 A.2d 682 (1939).

█ Limitation of cross-examination is also proper where the questions sought to be asked are repetitive or seeking information already elicited. *Ackerman* v. *Kogut,* 117 Vt. 40, 50, 84 A.2d 131 (1951); *State* v. *Lapan, supra,* 101 Vt. at 131.

█ The defendant bears the burden of showing that the exclusion of a particular question on cross-examination resulted in prejudice. *State* v. *Morrill, supra,* 127 Vt. at 513.

In *State* v. *Blair, supra,* a murder prosecution was defended on the ground of insanity. The state's witness, a physician, was asked on cross-examination about "irresistible impulse." This followed 47 pages of vigorous cross-examination. The question was excluded, for reasons not specified in the opinion. This Court upheld the exclusion, stating that the scope of cross-examination is in the discretion of the trial court and that sufficient latitude had been allowed on this cross-examination. It can be implied from this that the exclusion of a particular question, even if possibly a proper question, does not constitute reversible error, if great and sufficient latitude is in fact allowed on cross-examination.

Defendant claims that his cross-examination of Mrs. Badore was unduly restricted as to her residence.

Several United States Supreme Court cases have made clear that the right to confront witnesses includes a right to establish the identity of the witness so that the jury can place the witness in his environment, know who he is, and weigh his evidence. *Smith* v. *Illinois, supra,* and cases there cited. Questions as to residence are normally aimed at this identification. In the *Smith* case, the witness-informer gave a false name and address.

This record shows clearly that the identification of Mrs. Badore was extraordinarily complete. During the course of extended direct and cross-examination, Mrs. Badore's entire life story was laid before the jury. Certainly, the jury was able to identify this witness in her environment.

The defense argued below that the residence questions were to elicit from the witness the fact that she had been in protective police custody and that this may have affected her story. Just what connection this would have had to her credibility is not clear, but it was extensively brought out in prior direct and cross-examination that Linda had been protected by the police because of threats of bodily harm, that she had gone over her story numerous times with the police, and that she had visited all the locations and settings of the various parts of her testimony with the police, sometimes more than once.

In other words, the jury was well aware that the development of Mrs. Badore's testimony had taken place while she was in close contact with police. This line of questioning would have been repetitive. No abuse of discretion is shown.

Defendant also claims error in that his cross-examination of Mrs. Badore was improperly restricted relative to her intoxication at the time of the events to which she testified.

The witness stated in response to a question that she was not feeling well that day after the killing. The next question was: "And what was the reason you weren't feeling well?" Objection was made and sustained that the question exceeded

the scope of direct examination. The defense felt that the witness may have been impaired by intoxication.

 It is unquestioned that intoxication at the time of observation can affect a witness' ability to observe, recollect and therefore relate. It is therefore a permissible collateral matter to be inquired into for impeachment. 3 J. Wigmore, Evidence § 933 (J. Chadbourn rev. 1970).

On cross-examination Mrs. Badore had already testified at length concerning her drinking that evening and the number and type of drinks she had consumed before they left Burlington. She also said she "had a beer" between that time and the murder. She also testified she might have been "a little high" but she "wasn't drunk." It further appeared on cross-examination that she had an alcoholic problem at age 17 which had continued on through the date of the crime.

The extensive examination into the area of drinking brought this issue to the jury's attention. As far as this witness was concerned, this line of questioning was in depth and exhaustive. No attempt was made by defendant to show by other witnesses with whom Mrs. Badore had been in contact that night that she was intoxicated. There is no abuse of discretion shown.

 The defense also asked questions of Mrs. Badore relative to her three-month old baby. Defendant sought to show that a complaint about Mrs. Badore's treatment of her baby had been filed at some time by her mother. He suggested to the court that Mrs. Badore might have cooperated with authorities to the extent of fabricating a story to suit them in order to protect her custody of the child. Admittedly there was no evidence that even hinted any promises or threats were made to Mrs. Badore regarding her baby in order to get a fabricated story from her about the murder. On the basis of the record the questions were too remote and immaterial, but even if the exclusion was error, it is not shown just how it was prejudicial.

 The defense also asked questions of Mrs. Badore concerning her general use of narcotics—whether she had ever used them. The question did not point out the use of narcotics at any time and particularly at the time of the oc-

currence to which Mrs. Badore testified. The defense also inquired into the possibility of other criminal acts of the defendant in which Mrs. Badore participated as an accomplice. She had already testified she drove Berard on one "job" and had been with him on other criminal jobs. The question excluded was "What were those?" This, defendant claimed was to show her basic relationship with him and the underlying antagonism between them. This was a collateral matter irrelevant to the issue on trial.

Finally, the defense sought answers to the following questions:

> And did you ever have any conversations with anybody about the possibility of publishing this (a 96-page paper of events including those of August 12 and 13)?
>
> Linda did you ever state to the authorities at the hospital that you had been carried off to Boston by racketeers and gangsters?
>
> Linda, at any time, have you ever made allegations against other people of having been involved in criminal activity?
>
> Have you ever, Linda, made false accusations against any person involved—
>
> Linda, in the course of your medical treatment, have you ever related that you have been threatened by pistols and guns before?
>
> Have you ever been threatened by somebody with a gun before?

The above line of questioning related to matters which were irrelevant and too remote. Their connection to Mrs. Badore's credibility on the stand in this case is very indirect. The questions were in improper form, being too general in character and represented an exploratory cross-examination.

Based on our discussion above as to the scope of trial court's discretion in limiting the scope of cross-examination, we do not think that the trial court abused its discretion in limiting the foregoing line of questioning. The following language in *Teitle, supra,* 117 Vt. at 196, is appropriate here—"The pursuit of a witness into the realm of collateral must, of necessity, end somewhere—or litigation would not."

The testimony of Mrs. Badore was substantially corroborated by other testimony and physical evidence in the case touching on the vital issue on trial. With a thorough cross-examination of Mrs. Badore as to her moral and emotional difficulties already on the record in about 270 pages of transcript, we are of the opinion that even if the court had allowed answers it would not have changed the result of the verdict.

Our review of the entire record demonstrates the presence of overwhelming and uncontradicted evidence against the defendant. The opinion of Chief Justice Burger in *Milton* v. *Wainwright*, 407 U.S. 371 (1972), a first degree murder case, held that because the jury had heard overwhelming evidence of Milton's guilt, the error, if any, was harmless beyond a reasonable doubt. To the same effect, *Harrington* v. *California*, 395 U.S. 250 (1969); *Chapman* v. *California*, 386 U.S. 18 (1967); *Gilday* v. *Commonwealth*, 355 Mass. 799, 247 N.E.2d 396 (1969). The defendant has not shown how he was prejudiced by the questions excluded in his cross-examination of Mrs. Badore, and we find none.

 Lastly, the defendant claims the exclusion of the records of two admissions of Mrs. Badore to the Vermont State Hospital on September 7, 1968, and on August 17, 1969, was error.

Dr. George Brooks and Dr. William Woodruff, both psychiatrists, testified for the defense. The purpose was to show that Mrs. Badore had mental problems not only at the time of the murder but also at the time she testified and thus test the reliability of her testimony. It was in this respect that the records were offered, it being on the ground that they were made under the Uniform Business Records as Evidence Act.

Dr. Brooks, Superintendent at the State Hospital, testified that he did not know Mrs. Badore, never personally treated her, and that various professional people who examined and treated the patient made a record of their observations, diagnosis and findings. He further testified that the records would be helpful as part of her mental history to a psychiatrist making a present evaluation of her mental condition at the time of the murder and when she testified. But based on a review of the records, he could make only an "educated guess"

as to the present situation of the witness. To have admitted the records in the posture of this case would have allowed the introduction of hearsay evidence and deprived the state of its right of cross-examination of the professional personnel which participated in the examinations and reports.

However, the records were available to Dr. Woodruff. He not only reviewed them but also made use of them to aid him in forming his diagnoses and opinions given in testimony.

The records were not admissible as business records. The state of the evidence did not satisfy the requirements of 12 V.S.A. § 1700(b) or those stated in 32 C.J.S. *Evidence* § 728 and § 728(a). See also, *Wortheim* v. *Brace*, 116 Vt. 9, 10, 68 A.2d 719 (1949); *Crowley* v. *Goodrich*, 114 Vt. 304, 306, 44 A.2d 128 (1945). If for no other reason, the records would not have contributed anything of additional evidentiary value to the claimed purpose of the evidence. Moreover, it does not appear how the excluded evidence harmed the defendant. As we have often held, it is not enough that the excepting party allege error. He assumes the burden of showing that he has been prejudiced thereby. This he has failed to do.

The ruling of the court was without error.

On June 1, 1973, the defendant filed a motion in this Court for a new trial, based upon newly discovered evidence. No such motion was made in the court below. He argues that the state's theory of the case, based as it was on the testimony of Mrs. Badore, was impossible. This motion is jurisdictionally infirm and cannot be granted by us.

At the time the motion for a new trial was brought, such motions in criminal cases were governed by 13 V.S.A. § 7301 (repealed October 1, 1973, and superseded by V.R.Cr.P. 33). That statute made the new trial rules of civil actions applicable to criminal actions. V.R.C.P. 59 covered new trials for civil actions and subparagraph (a) provided that a motion for a new trial must be made to the court in which the action was tried. The obvious reason is, of course, that the motion would require a factual determination.

Under the procedure prior to V.R.C.P. 59 the discretion of the trial court governed the grant of new trial, subject to review here for abuse of discretion. *Allen* v. *Burlington Housing Authority*, 129 Vt. 8, 14, 270 A.2d 588 (1970). The

Reporter's Notes to V.R.C.P. 59 indicate that the law on June 1, 1973, was closely akin to that. This Court could only deal with a motion for new trial in the course of a regular appeal from the judgment below. V.R.Cr.P. 33 now covers this point.

We find no sound legal basis to require a reversal of the judgment below.

*Judgment affirmed. Let execution of sentence be done.*