# State of Vermont v. Douglas Brunelle

[534 A.2d 198]

No. 85-072

Present: **Allen, C.J., Hill, Peck, Gibson and Hayes,\* JJ.**

Opinion Filed August 14, 1987

*William S. Bos*, Windsor County State's Attorney, and *Emily S. Davis*, Deputy State's Attorney, White River Junction, for Plaintiff-Appellee.

*Fink & Birmingham, P.C.*, Ludlow, for Defendant-Appellant.

**Gibson, J.** Defendant was convicted of one count of operating a motor vehicle while under the influence of intoxicating liquor (DUI) with death resulting, and a second count of DUI with in-

---

\* Justice Hayes heard oral argument, but did not take part in the decision.

jury resulting.[1] Prosecution arose out of a two-car head-on colli-
sion in March of 1984 in which one person was killed and another
seriously injured. Defendant, the driver of one of the vehicles, was
transported by ambulance to Springfield Hospital where the in-
vestigating officer obtained a blood sample and statements from
him without advising him of his right to counsel and his right to
remain silent. 23 V.S.A. § 1202; *Miranda* v. *Arizona*, 384 U.S. 436
(1966).

Defendant moved to suppress the results of the blood-alcohol-
content (BAC) test, as well as all statements made by him at the
Springfield Hospital. Pursuant to a stipulation of the parties, the
trial court granted defendant's motion by an order entered June
5, 1984.

In January of 1985, the State gave notice of its intent to use the
BAC test to impeach defendant if he testified at trial. Defendant
then filed a motion in limine in which he sought to have the BAC
test results suppressed for all purposes. The court denied defend-
ant's motion and ruled that if, during his testimony, defendant
denied on direct or cross-examination that he had been under the
influence of intoxicating liquor, the State could then introduce
the BAC test results to impeach him as a witness.

Defendant did not testify at trial, and a jury found him guilty
on both counts. Defendant's motion for a new trial was denied,
and he subsequently appealed to this Court. We reverse. Al-
though federal cases are discussed herein, we base our decision
exclusively on the provisions of the Vermont Constitution. See
*Michigan* v. *Long*, 463 U.S. 1032, 1041 (1983).

The questions presented to this Court are (1) whether the self-
incrimination[2] or due process[3] clauses of the Vermont Constitu-
tion prohibit previously suppressed evidence from being intro-
duced for any purpose, and (2) whether previously suppressed ev-
idence may be used to impeach or rebut testimony given by a
defendant-witness on direct or cross-examination. These ques-

---

[1] In each count, defendant was convicted under 23 V.S.A. §§ 1201(a)(2) (DUI) and
1210(b) (DUI, death or injury resulting) (current version at 23 V.S.A. § 1210(e)
(DUI, death resulting) and (f) (DUI, injury resulting); 1983, No. 134 (Adj. Sess.),
§ 3).

[2] "[N]o person can] be compelled to give evidence against himself . . . ." Vt.
Const. ch. I, art. 10.

[3] "[N]or can any person be justly deprived of his liberty, except by the laws of the
land, or the judgment of his peers . . . ." Vt. Const. ch. I, art. 10.

tions in turn raise the issue of whether Vermont should adopt the doctrines set forth by the United States Supreme Court in *Harris* v. *New York*, 401 U.S. 222 (1971), and *United States* v. *Havens*, 446 U.S. 620 (1980).

## I.

*Harris* established that evidence obtained in violation of *Miranda* v. *Arizona*, 384 U.S. 436, could be used to impeach the testimony of a defendant-witness given on direct examination. *Harris*, 401 U.S. at 224-25. Prior to *Harris*, the long-standing and widely accepted rule was that unlawfully obtained evidence could never be used for impeachment purposes. *Agnello* v. *United States*, 269 U.S. 20, 33-35 (1925); see *Harris*, 401 U.S. at 231 n.4 (Brennan, J., dissenting); Dershowitz & Ely, *Harris* v. *New York: Some Anxious Observations on the Candor and Logic of the Emerging Nixon Majority*, 80 Yale L.J. 1198, 1208, 1215 (1971). Defendant maintains that this Court should adopt a rule similar to the one established in *Agnello*.

In affirming the conviction in *Harris*, the United States Supreme Court relied on *Walder* v. *United States*, 347 U.S. 62 (1954). In *Walder*, the issue on appeal was whether the defendant's assertion on direct examination that he had never possessed any narcotics opened the door, solely for purposes of impeachment, to the introduction of evidence unlawfully seized in connection with a prior, unrelated charge against him that had been dismissed two years earlier. *Id.* at 64. Justice Frankfurter, writing for the majority, held that such impeachment was permitted:

> It is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths.

*Id.* at 65. The Court distinguished defendant Walder's situation from that of the defendant in *Agnello*, where the defendant had been asked for the first time on cross-examination whether he had ever seen narcotics and, following his denial, was impeached with suppressed evidence seized in connection with the case then being tried. *Id.* at 66. The *Harris* Court, relying on *Walder*, rea-

soned that "[e]very criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury." *Harris*, 401 U.S. at 225.

Nine years later, the *Harris* doctrine was extended to allow impeachment based on testimony first elicited on cross-examination. In *United States* v. *Havens*, 446 U.S. 620, the Court held that "a defendant's statements made in response to proper cross-examination reasonably suggested by the defendant's direct examination are subject to otherwise proper impeachment . . . by evidence that has been illegally obtained . . . ." *Id.* at 627-28.

This case raises the *Harris-Havens* issue for the first time under the Vermont Constitution. Defendant argues that the federal rule should not be adopted because it is a radical departure from the previously established rule of *Agnello* and chills a defendant's right to testify. The State contends that the federal rule should be adopted by this Court because only the defendant's ability freely to commit perjury is hindered, not the right to testify. Thus, we consider two competing interests: (1) preservation of the right to testify freely, and (2) deterrence of perjury.

A state, as a matter of its own law in determining constitutional rights, may impose higher standards for police activity than those imposed by the United States Supreme Court under the federal constitution. *Oregon* v. *Hass*, 420 U.S. 714, 719 (1975); see also *Ker* v. *California*, 374 U.S. 23, 34 (1963) (states are not precluded from developing their own rules governing arrests, searches and seizures, provided those rules do not violate the constitutional proscription against unreasonable searches and seizures and the evidence so seized is not admissible against a person having standing to complain). Although we have held that the term "laws of the land" in Chapter I, Article 10 of the Vermont Constitution is synonymous with the term "due process of law" in the United States Constitution, *State* v. *Messier*, 145 Vt. 622, 627, 497 A.2d 740, 743 (1985); see *State* v. *Stimpson*, 78 Vt. 124, 132-33, 62 A. 14, 17 (1905); *Quimby* v. *Hazen*, 54 Vt. 132, 139 (1881), we also note that, as final interpreter of the Vermont Constitution, this Court has final say on what process is due in any given situation.

This Court has previously rejected a claim that because of its different language, the Vermont Constitution's self-incrimination clause is broader than its federal counterpart. *State* v. *Brean*, 136 Vt. 147, 151, 385 A.2d 1085, 1088 (1978). In *Brean*, the defendant

contested his conviction for drunk driving, arguing that Vermont's self-incrimination clause is broader than the federal provision because it uses the word "evidence" rather than "witness," which appears in the federal provision.[4] *Id.* We stated that "[b]oth this Court and the United States Supreme Court have recognized that the various state and federal constitutional provisions relating to self-incrimination, although using slightly variant phraseology, have a common origin and a similar purpose." *Id.* (citing *Schmerber* v. *California*, 384 U.S. 757, 761 n.6 (1966); *State* v. *Pierce*, 120 Vt. 373, 378, 141 A.2d 419, 422-23 (1958)).

We have also held that certain other provisions in the Vermont Constitution provide rights similar to those in the United States Constitution. See *State* v. *Dorn*, 145 Vt. 606, 619, 496 A.2d 451, 458 (1985) (particularity of descriptions in search warrants); *State* v. *Sprague*, 144 Vt. 385, 390 n.2, 479 A.2d 128, 131 n.2 (1984) (similar rights under the confrontation clause).

Nevertheless, this Court has also on occasion found that the Vermont Constitution affords greater rights than the federal constitution, which acts as a threshold for state-granted rights. See *In re E.T.C.*, 141 Vt. 375, 378, 449 A.2d 937, 939 (1982) (Chapter I, Article 10 requires that stricter criteria than are present under federal Fifth and Sixth Amendment *Miranda* rights must be met before a juvenile may waive right against self-incrimination and right to counsel); *State* v. *Ludlow Supermarkets, Inc.*, 141 Vt. 261, 268, 448 A.2d 791, 794-95 (1982) (Sunday closing law found to violate Chapter I, Article 7 prohibition against preferential legislation, a provision more stringent than the federal constitutional standard which requires only a rational justification); *State* v. *Becker*, 130 Vt. 153, 154, 287 A.2d 580, 581 (1972) (Chapter I, Article 10 gives right to trial by jury in misdemeanors as well as felonies).

The due process clause of the Fourteenth Amendment[5] guarantees every defendant the right to testify in his own defense. *In re Oliver*, 333 U.S. 257, 273 (1948). Implicitly contained in the right to due process in the federal constitution,[6] the opportunity to tes-

---

[4] The United States Constitution states, "nor shall [any person] be compelled in any Criminal Case to be a witness against himself . . . ." U.S. Const. amend. V.

[5] "[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. XIV.

[6] See *Faretta* v. *California*, 422 U.S. 806, 819 n.15 (1975) ("This court has often recognized the constitutional stature of rights that, though not literally ex-

tify on one's own behalf[7] was deemed so essential to the people of Vermont by the framers of our constitution that they stated it explicitly in Article 10:

> That in all prosecutions for criminal offenses, a person hath a right to be heard by himself and his counsel . . . .

Vt. Const. ch. I, art. 10.

Article 10 goes on to provide that no person may be justly deprived of his liberty "except by the laws of the land," a phrase that, as noted earlier, has been interpreted in Vermont to be synonymous with "due process of law."[8] See, e.g., *Quimby* v. *Hazen*, 54 Vt. at 139. Heretofore, only one dimension of the phrase "a person hath a right to be heard by himself and his counsel" has been construed, i.e., that of conferring a right to representation by counsel similar to the federal Sixth Amendment right. See, e.g., *State* v. *Rushford*, 127 Vt. 105, 108-09, 241 A.2d 306, 308-09 (1968); *In re Moses*, 122 Vt. 36, 41-43, 163 A.2d 868, 872-73 (1960). Today, we note that this phrase in Article 10 also explicitly includes the right to testify on one's own behalf.

------

pressed in the document, are essential to due process of law in a fair adversary process. It is now accepted, for example, that an accused has a right . . . to testify on his own behalf, see *Harris* v. *New York*, 401 U. S. 222, 225; *Brooks* v. *Tennessee*, 406 U. S. 605, 612; cf. *Ferguson* v. *Georgia*, 365 U. S. 570 . . . .").

[7] The important role of this right in a just legal system was recognized even in antiquity:

> If judgment's given before both sides are heard,
> The judgment may be just, but not the judge.
>
> Seneca, *Medea*, 198.

[8] Different states have interpreted the same constitutional clause differently under their own constitutions. For example, Section 8 of Article 1 of the Virginia Constitution—which served as a model for many of the early state constitutions, including those of Vermont and Vermont's more immediate model, Pennsylvania—is a criminal rights clause that contains much of Vermont's Article 10 language verbatim. Virginia's Section 8 does not, however, include the phrase that every person "hath a right to be heard by himself and by counsel," which appears in Pennsylvania's Section 9 and Vermont's Article 10. Hence, in Virginia, a right to counsel has been found under the "law of the land" clause of Section 8. *Stonebreaker* v. *Smyth*, 187 Va. 250, 256-57, 46 S.E.2d 406, 409-10 (1948). The due process right in Virginia, however, is found under a specific "due process of law" clause, Article 1, Section 11, which does not exist in the constitutions of Vermont and Pennsylvania. In Vermont and Pennsylvania, a right to due process has been found to be implied in the "law[s] of the land" clause. Vt. Const. ch. I, art. 10; Pa. Const. art. 1, § 9. This Court must interpret the Vermont Constitution in light of the document's distinct provisions and history.

We believe that admission of previously suppressed evidence to impeach credibility implicates a defendant's constitutional right to testify in his own defense. The defendant must choose between not testifying, and thus foregoing the opportunity to present his account of the incident, or testifying, and running the risk of being impeached with illegally obtained evidence. Despite the fact that a defendant may still elect to testify, the risk of admission of previously suppressed evidence to impeach credibility produces a chilling effect on the exercise of that right, and, as a result, acts as "a penalty imposed by courts for exercising a constitutional privilege." *Griffin* v. *California*, 380 U.S. 609, 614 (1965).

In addition to the concern that a defendant be assured an unfettered opportunity to testify on his own behalf, this Court is also concerned that a criminal defendant be given a fair trial. In *State* v. *Begins*, 147 Vt. 295, 299, 514 A.2d 719, 722 (1986), we held that the testimony of a probationer at a probation revocation hearing held prior to the disposition of related criminal charges is inadmissible against probationer during the subsequent criminal proceedings. We also held, however, that evidence derived from testimony at the earlier proceeding *may* be used for rebuttal or impeachment purposes if testimony on *direct* examination at the criminal trial clearly contradicts testimony made at the probation revocation hearing. *Id.* at 299-300, 514 A.2d at 722-23.

Seeking to balance these concerns, we therefore hold that previously suppressed evidence is unavailable to the State for impeachment purposes except when it is clear that the defendant has testified during direct examination in a manner contradictory to the suppressed evidence. In today's holding, we recognize that the due process clause of the Vermont Constitution gives a defendant greater rights than are afforded under *Havens*, where suppressed evidence may be used to impeach a defendant's testimony first made on cross-examination. We believe this rule will achieve a fair balance between defendant's right to testify on his or her own behalf and the State's interest in preventing perjury. To permit the use of suppressed evidence to impeach testimony first brought out on cross-examination would upset this balance and impose an untenable chilling effect on defendant's right to testify, in violation of Chapter I, Article 10 of the Vermont Constitution. The rule we have adopted will preclude the State from misusing inadmissible evidence while at the same time it will pro-

hibit a defendant from using to his or her advantage the State's inability to rebut clearly suspect testimony.

There is a qualification, however, to the application of this rule. Because our holding today limits impeachment of a criminal defendant in certain respects, we find it necessary to harmonize this holding with the rule contained in V.R.E. 611(b).[9] The Vermont cross-examination rule, which is similar to the English rule, limits the scope of cross-examination of a party-witness only in terms of materiality. It is based on the philosophy "that when a witness testifies, he should present all the facts unrestricted by technical rules of evidence. Court and counsel are relieved of the duty of determining when questions are within the proper scope of cross-examination and when they are without." Carlson, *Cross-Examination of the Accused*, 52 Cornell L. Q. 705, 706 (1967); see also *Rich* v. *Chadwick*, 139 Vt. 508, 509, 430 A.2d 1280, 1281 (1981) (when witness is a party, scope of cross-examination is limited only by materiality).

■ We believe, in line with our discussion above, that V.R.E. 611(b) must be limited where the prosecution seeks to impeach a criminal defendant by the use of suppressed evidence bearing directly on the crime charged. Cross-examination, normally limited under Rule 611(b) only by materiality, is hereafter restricted for prosecutors who cross-examine a criminal defendant. Only where a defendant has testified on direct examination to facts contradicted by previously suppressed evidence bearing directly on the crime charged may the prosecution use such evidence to impeach the defendant on cross-examination. With respect to collateral matters,[10] however, where defendant testifies on direct or cross-

---

[9] V.R.E. 611(b) provides: "Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness, except that when the witness is a party, the scope of cross-examination includes any matter of consequence to the determination of the action."

[10] Collateral facts are those "outside the controversy, or . . . not directly connected with the principal matter or issue in dispute." Black's Law Dictionary 237 (5th ed. 1979). See Note, *State v. Durepo: Toward A Principled Maine Version Of The Impeachment Exception To The Exclusionary Rule*, 37 Me. L. Rev. 383, 408 n.112 (1985). Contrasting the facts of *Walder* with those of *Harris* may be helpful in demarcating the difference between collateral evidence and noncollateral evidence. In *Walder*, the collateral evidence used to impeach the defendant related to an investigation which occurred two years before the pending criminal charge; in *Harris*, the evidence used to impeach the defendant related to the crime with which the defendant was then charged. See Dersho-

examination to facts not bearing directly on the crime for which he or she is on trial, it remains within the discretion of the trial court whether suppressed evidence that relates only to such collateral matters, and not to the crime charged, may be admitted for impeachment purposes. See *State* v. *Gilman*, 145 Vt. 84, 87, 483 A.2d 598, 599 (1984); *State* v. *Howe*, 136 Vt. 53, 65, 386 A.2d 1125, 1132 (1978); *State* v. *Berard*, 132 Vt. 138, 146, 315 A.2d 501, 507-08 (1974); McCormick on Evidence § 47, at 100 n.58 (1972). This approach is consistent with the rule governing impeachment of a criminal defendant by evidence of a prior crime, where "[a]n especially severe possibility of prejudice exists when the crime to be introduced for impeachment is similar to or the same as the crime for which the defendant is accused." *State* v. *Gardner*, 139 Vt. 456, 460-61, 433 A.2d 249, 251 (1981). So, too, when the court permits evidence not directly bearing on the crime charged to be used to impeach, we believe it is easier for the jury to evaluate whether the defendant is a truth-teller without prejudging the defendant's guilt. Thus, impeachment through suppressed evidence going to collateral matters shall not be subject to this limitation of V.R.E. 611(b) and shall be left in the discretion of the trial court.[11]

---

witz & Ely, *Harris v. New York: Some Anxious Observations on the Candor and Logic of the Emerging Nixon Majority*, 80 Yale L. J. at 1216.

[11] Although we base our holding on the right to testify in Article 10 of the Vermont Constitution, we recognize that impeachment with suppressed evidence also implicates Article 10's privilege against self-incrimination. Today we create a limited exception to *State* v. *Badger*, 141 Vt. 430, 452-53, 450 A.2d 336, 349 (1982), which held that "[e]vidence obtained in violation of the Vermont Constitution, or as the result of a violation, cannot be admitted at trial as a matter of state law." In so modifying *Badger*, we do not diminish our concern that the use of "[e]vidence obtained in violation of the Vermont Constitution" be severely limited. In this case the evidence in question was obtained in violation of certain *Miranda* warnings. We note that while the requirements of *Miranda* have been consistently implemented by this Court, see, e.g., *State* v. *Trombley*, 147 Vt. 371, 374-77, 518 A.2d 20, 23-24 (1986); *State* v. *Anderkin*, 145 Vt. 240, 244-45, 487 A.2d 142, 144 (1984); *State* v. *Killary*, 133 Vt. 604, 606, 349 A.2d 216, 217 (1975), this Court has never explicitly addressed whether *Miranda*'s warnings are also required under the Vermont Constitution. See *In re E. T. C.*, 141 Vt. at 378, 449 A.2d at 939. We take this opportunity today to note expressly: evidence obtained in violation of *Miranda* is also in violation of the privilege against self-incrimination in Article 10 of the Vermont Constitution.

## II.

. We address briefly two other issues raised by the State. The State argues that the defendant may not raise due process or self-incrimination issues on appeal in the absence of any testimony or offers of proof at trial, citing *Luce* v. *United States*, 469 U.S. 38 (1984). The State's reliance on *Luce* is misplaced. In *Luce*, the United States Supreme Court distinguished the facts in that case, where a federal court's preliminary ruling on a question *not reaching constitutional dimensions* was held not to be reviewable, from its earlier cases, *Brooks* v. *Tennessee*, 406 U.S. 605 (1972), and *New Jersey* v. *Portash*, 440 U.S. 450 (1979), where the Court reviewed *constitutional* challenges to state court rulings which acted to discourage defendants from testifying. *Luce*, 469 U.S. at 42-43. Thus, *Luce* is not controlling because, in contrast to the case at bar, it did not involve constitutionally suppressed evidence. See *Portash*, 440 U.S. at 456 (federal law does not require defendant to take the witness stand in order to raise his Fifth Amendment privilege against compulsory self-incrimination); *Brooks*, 406 U.S. at 606, 612 (Tennessee's requirement that criminal defendant "desiring to testify shall do so before any other testimony for the defense is heard by the court trying the case" violates defendant's Fifth Amendment privilege against compulsory self-incrimination).

Second, the State argues that because the BAC test results were obtained in violation of a statutory provision not rising to constitutional dimensions, the admission of the evidence does not trigger constitutional safeguards. We need not discuss this issue further in light of our holding, other than to note that the admission of suppressed evidence, taken in violation of a statutory provision, does reach constitutional dimensions when it interferes with a defendant's right to testify in his own defense or with his right against self-incrimination, as provided in Chapter I, Article 10 of the Vermont Constitution.

*Reversed and remanded.*

**Peck, J.,** dissenting. I am compelled to dissent from the result reached by the majority as well as from the rationale upon which it is based.

The primary purpose of a criminal trial is to enable the court and jury to determine the truth and, in so doing, to exonerate the

innocent as well as to convict the guilty. I recognize that there are limits which must be rigidly enforced, including physical or mental cruelty by the authorities, even when redolent of pure technicality. Nevertheless, any judicially imposed devise which results in withholding facts from the jury, which would otherwise aid in the search for truth, and which not only condones but licenses perjury as well, as does today's decision, is from the very purpose of trial; it should be adopted only with reluctance and after careful scrutiny.

Defendants in criminal cases have a right to a fair trial, but in their zeal to protect that right, too many courts long ago lost sight of the fact that fairness is, in a sense, a two-edged sword. We must not divorce the concept of the word "state" from the people who *are* the state. The Preamble to our Federal Constitution begins with the phrase "We the people." These people are much more than a sort of collective "person." Each one is an individual, a citizen of the state and nation created by their ancestors; as much so as a defendant. They have the right to be secure in their homes and possessions; to be free to walk the streets alone at any hour of the day or night without fear of the violence which is so prevalent in today's society; to drive in their automobiles, also without fear of irresponsible drunks behind the wheel of another vehicle; to send their children to school free from the seductive blandishments and pressures of peers, drug dealers and pushers, and from those with a propensity for child abuse.

The motor vehicle accident which gave rise to this proceeding was particularly tragic. As the majority notes, one person was killed—deprived of life—and another seriously injured. It is ironic that the record in this case indicates that the test of the blood sample taken from defendant showed an alcohol content more than half again above the legal maximum. And yet, because of a relatively inoffensive error on the part of the police in acquiring the sample, the test result cannot be considered by the court or known to the jury, even if the defendant takes the witness stand and, during cross-examination, deliberately lies under oath. Thus are the interests of the people "fairly" served by today's decision.

The majority opinion laments the defendant's "difficult dilemma" in facing the truth unless he is sheltered by the court:

> The defendant must choose between not testifying, and thus foregoing the opportunity to present his account of the incident, or testifying, and running the risk of being impeached with illegally obtained evidence.

This distorts the true situation. Placed in its proper perspective, the majority is saying that, in the face of suppressed evidence against him, a defendant has a *constitutional right* to take the stand and, regardless of his oath to tell the truth, lie with impunity under cross-examination; to give "his account of the incident" which is not only false, but protected. Whether a given defendant will lie in fact is irrelevant to the principle; the fact is, the majority has placed its imprimatur upon a constitutional right to commit perjury.

But a criminal defendant who takes the stand as a witness in his own behalf as he has the right to do, is subject to the same oath-bound duty as any other witness; that is, to tell the truth. If he is prepared to do that, and he is indeed innocent, he has little to fear, at least from evidence that would be fully admissible were it not for police error. If he is not willing to be truthful notwithstanding his oath, he has the proper alternative of not taking the stand at all, leaving the State to its burden of proof beyond a reasonable doubt. A defendant has no right, certainly not a constitutional right, to an "opportunity to present his account of the incident" which is perjurious. It is important to remember that, once suppressed, evidence remains suppressed, even under the less truth-strangling federal rule of *United States* v. *Havens*, 446 U.S. 620 (1980). Therefore, a defendant has no cause to fear suppressed evidence, unless, by his own voluntary conduct as a witness, he creates the justification for its use: the protection of truth and the concern of the people for safety and justice.

The majority's "analysis," shorn of its trappings, concludes that the right of a defendant to testify in his own defense, under Chapter I, Article 10 of the Vermont Constitution, carries with it the right to commit perjury. This is contrary to common sense and demeans valid analytical reasoning. Like Hans Christian Andersen's tale "The Emperor's New Clothes," it discloses clearly what it is meant to conceal: the conclusion is reached by a result-oriented approach.

The real choice confronting a criminal defendant who knows of the existence of suppressed evidence should be whether to take

the stand and face his obligation to tell the truth, or to remain silent with the protective guarantee of the State's burden, and the knowledge that the prosecution may not comment on his silence. *Griffin* v. *California*, 380 U.S. 609 (1965); see, e.g., *State* v. *Hamlin*, 146 Vt. 97, 103-04, 499 A.2d 45, 50-51 (1985).

The majority argues that its new rule will "preclude the State from misusing inadmissible evidence while at the same time it will prohibit a defendant from using to . . . advantage the State's inability to rebut clearly suspect testimony"; this rationale is flawed. Far from prohibiting "a defendant from using to . . . advantage the State's inability to rebut clearly suspect testimony," the majority decision condones and encourages it. I recognize that the decision departs from the federal rule only in relation to testimony first elicited on cross-examination. Nevertheless, it is news to me, and certainly a novel concept, that "clearly suspect testimony" is never elicited from a criminal defendant for the first time on cross-examination.

Suspect testimony is as likely to emerge for the first time during cross-examination as it is on direct; perhaps more so because it is always difficult to anticipate either the form or substance of a prosecutor's questions. Cross-examination by a competent trial attorney is one of the best means for testing truth known to the judicial system, and yet, by throwing the cloak of an extreme technicality about defendants as a matter of law, the majority has frustrated the search for truth and enfeebled the very *raison d'etre* of cross-examination, not only for this case, but for similar cases in the future.

The real irony inherent in a criminal defendant's motion to suppress evidence lies in the obvious fact that the constitutional principle claimed, however eloquently it may be urged, is a secondary motive at best; as a practical reality it is a peg to hang a hat on. No doubt there are those who have died or suffered upon the barricades of a principle; I doubt much, however, that there are many defendants, however innocent or guilty in a particular case, among that heroic number. The motivation for a defendant's motion to suppress is, obviously, in almost every instance, filed with the sole objective in mind, not of upholding or establishing a principle, but of *withholding truth* which is inculpatory or otherwise damaging to the defense; in short, to insure that the case will be decided without the full truth ever becoming known to the jury.

Given the obvious fact that the real purpose of most motions to suppress is to withhold truth, the egregious nature of the new majority rule is highlighted, rather than disguised, by the fact that it is only suppressed truth relating to a defendant's guilt of the crime itself which may not be explored in the face of perjury. Mere collateral matters, which frequently have little effect on the outcome, if crime-related evidence is to remain suppressed even in the face of perjury, may be explored. This exception does little if anything to mitigate the consequences of denying a jury the whole truth relating to a defendant's involvement in the crime itself. Granting that the majority rule carves out a limited exception, it is nevertheless a grievous one against the concern for truth. The ubiquitous camel has succeeded in thrusting its nose under one more tent.

My second objection to the majority's opinion relates to its reliance on the Vermont Constitution to justify, if not mandate, the result. If the language of the Constitution is clear in awarding criminal defendants greater rights than they enjoy under the Federal Constitution, then I will join without hesitation in enforcing these expanded protections regardless of any personal belief I may have that they are unwise or even detrimental to the welfare and safety of the people. See *State* v. *Jewett*, 146 Vt. 221, 500 A.2d 233 (1985). I will not try to circumvent them by judicial rhetoric. The Constitution belongs to the people, not to the courts.

Notwithstanding the above, I object and will continue to do so strongly, whenever this Court undertakes to read into our State Constitution language which is simply not there, or a mandate which does not rationally and logically derive from the wording which has been employed by its framers and adopted by the people; such results are whim-motivated and result-oriented. But that is precisely what has happened here, and I see no other demonstrable reasons than to activate a rule, sub silentio, which the majority believes the Federal Court *should*, and this Court *would* have adopted under the Federal Constitution had it the power to do so. In other words the United States Supreme Court is *wrong*; it is as simple as that. But since this Court has no power to abrogate or affect United States Supreme court interpretations of the Federal Constitution, the same objective can be accomplished, as far as this state is concerned, merely by *saying* the Vermont Constitution requires it.

The majority may have found its inspiration from our opinion in *Jewett*. In that case, we directed the parties to prepare and file supplemental briefs addressing a state constitutional issue which had been raised by the defendant but inadequately briefed. The *Jewett* opinion noted that state constitutions may provide broader protections for criminal defendants than its federal counterpart.[1] Thereupon, the opinion continued by suggesting several approaches which might be employed in analyzing a state constitution, including, inter alia, historical, textual, examining what the courts of other states have done under similar constitutional provisions, economic and sociological concerns, and others.

Notwithstanding *Jewett* was a decision of the full Court, the majority in this case has made no valid attempt to analyze the Vermont Constitution. In addressing the state constitutional issue, the majority's concept of analysis, basically, is to tie a defendant's right to testify to a right to commit perjury. Then after bemoaning the pickle in which a perjuring defendant may find himself as a result of impeachment through the use of otherwise suppressed truth, the majority simply plucks its holding out of thin air, concluding that "the Vermont Constitution gives a defendant greater rights than are afforded under *Havens* . . . ." This conclusion, as being legitimately derived from the Constitution, as distinguished from mere personal preference, is baffling. The greater right awarded is to commit perjury with impunity, a defendant's obligation to tell the truth becoming meaningless. If the result, which licenses and applauds perjury under certain circumstances, "will achieve a fair balance" under the Vermont Constitution, as the majority claims it does, the fairness discoverable in condoned lying under oath somehow escapes me.

In responding to the question "what process is due?" under the Vermont Constitution, the majority does not point to any language or resort to any analysis that justifies treating a criminal defendant with greater leniency under the fundamental Vermont law than under the Federal Constitution. The constitutional claim in *Jewett* was based, in part at least, on an actual and arguably significant difference between the language in the search and seizure provisions of the two constitutions. No significant dif-

---

[1] In *Jewett* Justice Hayes, writing for the full Court, cautioned: "It would be a serious mistake for this Court to use its state constitution chiefly to evade the impact of the decisions of the United States Supreme Court. Our decisions must be principled not result-oriented." *Id.* at 224, 500 A.2d at 235.

ference exists here; the majority virtually concede this. Yet, adding to the bewilderment generated by today's decision, the Court in a later *Jewett* case, *State* v. *Jewett*, 148 Vt. 324, 532 A.2d 958 (1987), which followed the remand for further briefing as ordered in the original 1985 case, held against the defendant's claim under the Vermont Constitution, whereas, in this case, where there are no meaningful distinctions between the relevant wording of the two constitutions, the majority says there is one. This is an extract of thin air. The majority, for all the world like a prestidigitator, has simply plucked a legal bunny from its hat.

I believe there is much merit in looking to decisions of the United States Supreme Court for guidance in construing provisions in state constitutions unless the local provisions are so clear that a different result is inescapable rather than merely contrived. I will mention some of my reasons.

All the courts of this country, federal and state, face identical problems relating to the rights of criminal defendants vis-a-vis the rights of the people to be safe from violence against their persons, and secure in their property against robbery, arson, and the like. Except to the extent the clear language of a particular state constitution *compels* a different result, I see no reason why the "process due" criminal defendants should have the potential for varying not only from state to state, but also as between defendants in the federal and state courts. This potential is anomalous and a legal absurdity based on the transitory personal whims and philosophies of the members of fifty different state high courts as they are constituted at a particular point in time. It calls to mind George Orwell's famous line in his book "Animal Farm": "All animals are equal, but some animals are more equal than others."[2]

We have all the interstate and sectional xenophobia we need in athletic rivalries, where state and sectional teams, professional and collegiate, and others, strive to outdo each other and are supported locally to the point of near public hysteria. There is no reason for such chauvinism among the courts of the several states to the extent that the "process due" a criminal defendant in one state is greater or less than it is in another, unless the language of a given state constitution leaves no other choice. Frequent reference to, and adoption of, constitutional principles established by the highest Court in the country will help to assure and inform,

---

[2] George Orwell, Animal Farm [Chapter 10, 1946].

not only criminal defendants, but all people, that entitlement to due process is the same throughout the land and does not change simply because a man steps across the invisible line known as a state boundary.

I would point out the danger of proving the validity of Thomas Jefferson's fear of the judiciary. In 1803, Jefferson wrote to a friend: "Let us not make it [the Constitution] a blank paper by construction."[3] Sixteen years later, he wrote in a similar vein: "The Constitution, on this hypothesis [the power of the courts alone to declare the meaning of the Constitution], is a mere thing of wax in the hands of the judiciary, which they may twist and shape into any form they please,"[4] to which I would add: and *whenever* they please.

The inherent danger which lies in the unbridled power of the courts over American-type constitutions was recognized abroad as well as at home. In the middle of the nineteenth century, the English historian, author and statesman, Thomas Babington Macauley wrote to an American correspondent: "Your Constitution is all sail and no anchor";[5] a most apt and astute analogy.

Even more recently, former Chief Justice Charles Evans Hughes said in a speech:[6] "the Constitution is what the judges say it is." In more esoteric, and perhaps (to the layman) obscure phraseology, Justice William J. Brennan, Jr., said essentially the same thing when he wrote, "It is, after all, a national Constitution we are expounding." *Jacobellis* v. *Ohio*, 378 U.S. 184, 195 (1964).

Returning to literary analogies, I cannot help speculating that Chief Justice Hughes, in recognizing that courts have exclusive, or at least final power to say what the Constitution means, may have read and remembered Lewis Carroll's "Through the Looking Glass." I am intrigued by an interesting similarity to Hughes' statement and a dialogue between Alice and Humpty Dumpty, in which the former questioned the latter as to his proper use of a word (which was, of course, wrong):

> "When I use a word," Humpty Dumpty said, . . . "it means just what I choose it to mean . . . ."

---

[3] Letter to William C. Nichols, Sept. 7, 1803.
[4] Letter to Spencer Roane, Sept. 6, 1819.
[5] Letter to H. A. Randall, May 23, 1857.
[6] To the Elmira, N.Y., Chambers of Commerce, May 3, 1907.

> "The question is," said Alice, "whether you *can* make words mean so many different things."
>
> "The question is," said Humpty Dumpty, "which is to be master—that's all."[7] (emphasis in original).

The analogy is interesting. The United States Supreme Court is "master" of the Federal Constitution with the final power to say what it means, and this Court has the like power as "master," in saying what the Vermont Constitution means—regardless of the validity of its reasoning in a particular case.

Judge Learned Hand understood the bench very well when he wrote: "[T]hey [judges] too often wrap their [decisions] in a protective veil of adjectives such as . . . 'inherent,' 'fundamental,' or 'essential,' whose office usually . . . is to disguise what they are doing and impute to it a derivation far more impressive than their personal preferences, which are all that in fact lie behind the decision."[8] The majority opinion demonstrates that Judge Hand understood this flaw in the judicial mentality perhaps even better than he knew.

These reflections by eminent men should, with other considerations, it seems to me, endow those appointed or elected to judicial office, particularly those on the courts of final appeal, with a sense of awe, humility, and respect for the incredible power which is vested *in the office* (let it be remembered, not in the person, per se). They should be inspired to exercise their enormous powers with the greatest caution and restraint, even with reluctance. Instead, this power is all too often looked upon as a license to accomplish whatever passing fancy engages the favor of a court as it happens to be constituted at any given time.

In the field of constitutional law, this enthrallment with, and extravagant use of, the power to interpret, the power to render a constitution little more than a quaint historical document, a *tabula rasa* upon which may be written whatever the courts desire to write, is the hallmark of egregious judicial activism. I hasten to add, that activism is by no means to be deplored, per se; at its best, great and necessary reforms have resulted from the impact of activism on the Congress and state legislatures. But judicial activism at its worst is the unbridled and irresponsible re-

---

[7] Lewis Carroll (Charles Lutwidge Dodgson), Through the Looking Glass, Macmillan and Co., London, 1872, * 124.

[8] Learned Hand, The Bill of Rights 70 (1964 ed.).

sort to the unlimited power of constitutional interpretation upon which too many courts have embarked today. This is the surest way to destroy a constitution or at least render it meaningless, except as a judicial toy, that one can imagine.

If, as Hughes and others have recognized, constitutions, state and federal, mean whatever the highest courts having jurisdiction say they mean, and that power of interpretation is not exercised with restraint, we may as well adopt "Mary Had a Little Lamb" for constitutional purposes. The courts can say the nursery rhyme means whatever they wish it to mean, and we can all boast of its wisdom and endurability amid the storms of change and progress. I am reminded of the childhood taunt, "Your sayin' so don't make it so." Quite the opposite is true of the courts, their "sayin' so" apparently does make it so, regardless of merit.

The majority has reached a conclusion which is without the support of the valid analysis of our State Constitution which we demanded of the bar with great enthusiasm in the first *Jewett* case (in 146 Vt.); without any reasonable explanation of why the protection of the Vermont Constitution is greater than under the Federal Constitution, carrying with it the right to commit perjury if necessary. It is contrary to plain common sense which would dictate that nothing justifies the licensing of perjury—lying under oath—by a defendant, or any other witness, during the course of trial. I believe that today's result serves as notice that the majority is joining, like sheep, in the headlong rush of other egregiously activist courts, to grant greater rights to criminal defendants under state constitutions than they enjoy under the Federal Constitution (which are many), while at the same time, and, as a corollary, eroding even further the protections and safety of individual law-abiding citizens.

Crime in this country is increasing rapidly to the point it seems virtually out of control. The cost burden to the public is staggering; crime victims and the public at large cry out for relief and for better protection. In the face of this crisis the courts are busily at work, sapping effective law enforcement with technicalities, and adding more and endlessly more escape routes for the criminal, which are not necessary to protect the truly innocent defendant. I view today's decision as an egregious example. It is well enough that Supreme Court Justice Tom Clark could write, "there is no war between the Constitution and common sense." *Mapp* v. *Ohio*,

367 U.S. 643, 657 (1961). The majority appears to think otherwise. I would affirm.